UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL S. FLAHERTY, et al.,           :
                                       :
            Plaintiffs,                :
                                       :
        v.                             : Civil Action No. 11-660 (GK)
                                       :
JOHN BRYSON,[1] in his official        :
capacity as Secretary of the           :
Department of Commerce, et al.,        :
                                       :
            Defendants.                :

MEMORANDUM OPINION

Plaintiffs Michael S. Flaherty, Captain Alan A. Hastbacka, and the Ocean River Institute bring this suit against Defendants Commerce Secretary Gary Locke, the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS"). Plaintiffs allege that Amendment 4 to the Atlantic Herring Fishery Management Plan violates the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 et seq.

This matter is now before the Court on Cross-Motions for Summary Judgment [Dkt. Nos. 17, 19]. Upon consideration of the Motions, Oppositions, Replies, Oral Argument, Supplemental Briefs,

---

[1] Secretary Bryson is substituted for Gary Locke pursuant to Federal Rule of Civil Procedure 25(d).

the entire record herein, and for the reasons stated below, Plaintiffs' Motion for Summary Judgment is **granted in part and denied in part** and Defendants' Motion for Summary Judgment is **granted in part and denied in part**.

I.    BACKGROUND

    A.    Statutory Background

        1.    The Magnuson-Stevens Act

Congress first enacted the MSA in 1976 "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1). The Act provides a "national program" designed "to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." <u>Id.</u> § 1801(a)(6).

In order to balance the need for "a cohesive national policy and the protection of state interests," the MSA establishes eight Regional Fishery Management Councils composed of federal officials, state officials, and private parties appointed by the Secretary of Commerce. <u>C&W Fish Co. v. Fox</u>, 931 F.2d 1556, 1557 (D.C. Cir. 1991); 16 U.S.C. § 1852. These councils are responsible for developing fishery management plans ("FMPs") for fisheries in federal waters within the United States Exclusive Economic Zone,

which includes ocean water from three to two hundred miles offshore. Id. § 1853.

Each council must prepare and submit to NMFS[2] an FMP and any amendments that may become necessary "for each fishery under its authority that requires conservation and management." Id. § 1852(h)(1). FMPs must include the "conservation and management measures" that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery."[3] Id. § 1853(a)(1)(A).

---

[2] The Secretary of the Department of Commerce has delegated the authority and stewardship duties of fisheries management under the MSA to NMFS, an agency within the Department. Compl. ¶ 13. On behalf of the Secretary, NMFS reviews FMPs and FMP amendments and issues implementing regulations. Id.

[3] The Act defines "conservation and management" as:

> all of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment; and (B) which are designed to assure that–
>
> (i) a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis;
>
> (ii) irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and
>
> (iii) there will be a multiplicity of options available with respect to future uses

(continued...)

FMPs must also be consistent with the ten "National Standards" provided for in the MSA, as well as all other provisions of the MSA, and "any other applicable law." <u>Id.</u> § 1853(a)(1)(C); <u>see also id.</u> § 1851 (setting forth National Standards).

Once a council has developed a plan, NMFS must review the plan to determine whether it comports with the ten National Standards and other applicable law. <u>Id.</u> § 1854(a)(1)(A). Next, after a period of notice and comment, NMFS must "approve, disapprove, or partially approve a plan or amendment," depending on whether the plan or amendment is consistent with the Standards and applicable law. <u>Id.</u> § 1854(a)(3). Even if NMFS disapproves the proposed FMP or amendment, it may not rewrite it. That responsibility remains with the council, except under specifically defined circumstances. <u>Id.</u> §§ 1854(a)(4), (c). If NMFS approves the plan or does not express disapproval within 30 days, the FMP becomes effective. <u>Id.</u> § 1854(a)(3).

At the beginning of 2007, Congress re-authorized and amended the MSA. Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 ("MSRA"), P.L. 109-479, 120 Stat. 3575 (2007). One of the goals of the MSRA was to "set[] a firm deadline to end overfishing in America." 2007 U.S.C.C.A.N. S83, S83. To

---

[3](...continued)
       of these resources.

16 U.S.C. § 1802(5).

accomplish this purpose, Congress added provisions to the MSA calling for science based limits on total fish caught in each fishery.

The amended MSA requires the regional councils to add to all FMPs mechanisms for setting the limits, termed Annual Catch Limits ("ACLs"), on the amount of fish caught and accountability measures ("AMs") for ensuring compliance with the ACLs. 16 U.S.C. § 1853(a)(15). These limits and accountability measures must take effect "in fishing year 2011" for most fisheries, including the Atlantic herring fishery.[4] Pub. L. No. 109-479, § 104(b), 120 Stat. 3575, 3584.

## 2.   The National Environmental Policy Act

Congress enacted NEPA in order "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b). To accomplish that goal, NEPA requires all federal agencies to prepare an

---

[4] The MSRA sets an earlier deadline of "fishing year 2010 for fisheries determined by [NMFS] to be subject to overfishing." Pub. L. No. 109-479, § 104(b), 120 Stat. 3575, 3584. The statute defines "overfishing" or "overfished" as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34). NMFS has not determined the Atlantic herring fishery to be overfished.

Environmental Impact Statement ("EIS") whenever they propose "major Federal actions significantly affecting the quality of the human environment." Id. § 4332(2)(C).

To determine whether an EIS must be prepared, the agency must first prepare an environmental assessment ("EA"). 40 C.F.R. § 1501.4(b). An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." Id. § 1508.9(a). Even if the agency performs only an EA, it must still briefly discuss the need for the proposal, the alternatives, and the environmental impacts of the proposed action and the alternatives. Id. § 1508.9(b). If the agency determines, after preparing an EA, that a full EIS is not necessary, it must prepare a Finding of No Significant Impact ("FONSI") setting forth the reasons why the action will not have a significant impact on the environment. Id. §§ 1501.4(e), 1508.13.

### B.  Factual Background

Plaintiffs challenge Amendment 4 to the Atlantic Herring Fishery Management Plan, developed by the New England Fishery Management Council (the "Council"). 76 Fed. Reg. 11373 (Mar. 2, 2011). Atlantic herring (Clupea harengus) have been managed through the Atlantic Herring FMP since January 10, 2001. Administrative Record ("AR") 5578.

Atlantic herring inhabit the Atlantic Ocean off of the East coast of the United States and Canada, ranging from North Carolina to the Canadian Maritime Provinces. Id. at 6091. Atlantic herring can grow to about 15.6 inches in length and live 15-18 years. Id. at 6092. Atlantic herring play a vital role in the Northwest Atlantic ecosystem, serving as a "forage species," i.e. food, for a number of other fish, marine mammals, and seabirds. Id. at 6111.

Human beings also hunt Atlantic herring. Fishermen and women predominantly catch Atlantic herring using midwater trawl gear, paired midwater trawls, and purse seines. AR 6146. To do this, boats working alone or in tandem drag nets through the water scooping up fish as they go. Not surprisingly, these nets snare large numbers of other fish and marine wildlife at the same time. Id. at 6146-48, 6170-80.

Of particular concern to Plaintiffs are four species, often caught incidentally with Atlantic herring, collectively referred to as "river herring": (1) blueback herring (Alosa aestivalis), (2) alewife (Alosa pseudoharengus), (3) American shad (Alosa sapidissima), and (4) hickory shad (Alosa mediocris). See Pls.' Mot. 1. River herring are apparently so-called because they are anadromous--that is, they spawn in rivers but otherwise spend most of their lives at sea, whereas Atlantic herring spend their entire lives at sea. Id. It is undisputed that river herring play a similar role to Atlantic herring, providing forage for large fish

and mammals, including cod, striped bass, bluefin tuna, sharks, marine mammals, and seabirds. Id. at 1, 8; see also AR 763-64. The Atlantic Herring Fishery Management Plan, as updated by Amendment 4, provides ACLS and AMs for Atlantic herring but not for river herring.

### C.   Procedural Background

On May 8, 2008, NMFS published a Notice of Intent, announcing that the Council would be preparing Amendment 4 to the Atlantic Herring FMP as well as an Environmental Impact Statement. AR 5577. The Notice explained that the MSRA required that ACLs and AMs be established by 2011 for all fisheries not subject to overfishing. Id. at 5578. Because the Atlantic herring fishery had not been determined to be subject to overfishing, Amendment 4 was "necessary to update the Herring FMP in a manner . . . consistent with the new requirements of the MSRA" and was required to be in place by 2011. Id.

The Notice also indicated measures under consideration by the Council. Specifically, the Notice stated that Amendment 4 might address as many as five objectives:

> 1.   To implement measures to improve the long-term monitoring of catch (landings and bycatch) in the herring fishery;
>
> 2.   To implement ACLs and AMs consistent with the MSRA;
>
> 3.   To implement other management measures as necessary to ensure compliance with the new provisions of the MSRA;

4.   To develop a sector allocation process or other LAPP ["Limited Access Privilege Program"] for the herring fishery; and

5.   In the context of objectives 1-4 (above), to consider the health of the herring resource and the important role of herring as a forage fish and a predator fish throughout its range.

Id.

However, on December 28, 2009, NMFS and the Council changed course. At that time, NMFS issued a second Notice of Intent explaining that "only the ACL/AM components will move forward as Amendment 4, and that the Council intends to prepare EA for the action." Id. at 5640-41. In addition, "[a]ll other proposed measures formerly included in Amendment 4, including the catch monitoring program for the herring fishery, measures to address river herring bycatch, criteria for midwater trawl access to groundfish closed areas, and measures to address interactions with the mackerel fishery, will now be considered in Amendment 5." Id. at 5641. The Notice also promised that those "measures will be analyzed in an EIS" to be issued with Amendment 5. Id.

In short, the Government dropped from Amendment 4 any attempt to add protections for fish other than the Atlantic herring, such as the river herring of concern to Plaintiffs in this litigation, electing only to address Atlantic herring ACLs and AMs.

On March 2, 2011, NMFS published Amendment 4 as a Final Rule in the Federal Register. Id. at 6325. In keeping with the December

28, 2009 Notice of Intent, Amendment 4 designated Atlantic herring as the only "stock in the fishery" and did not provide for any measures specifically targeted at protecting river herring. Id. at 6326. The Final Rule implemented an Interim Acceptable Biological Catch ("ABC") Control Rule for Atlantic herring, from which ACLs could then be determined. Id. at 6327. The Final Rule also established three AMs: (1) when a threshold amount of Atlantic herring is caught, NMFS is to close relevant management areas; (2) if a certain amount of haddock is incidentally caught, vessels are to face restrictions; and (3) if the total amount of Atlantic herring caught in a year exceeds any ACL or sub-ACL, the ACL or sub-ACL is to be reduced by a corresponding amount in the year after the calculation is made. Id.

On April 1, 2011, Plaintiffs filed their Complaint [Dkt. No. 1]. Plaintiffs allege that: (1) Defendants violated the MSA and APA by failing to include catch limits for river herring in Amendment 4; (2) Defendants violated the MSA and APA by failing to set adequate ACLs for Atlantic herring in Amendment 4; (3) Defendants violated the MSA and APA by failing to set adequate AMs for Atlantic herring in Amendment 4; and (4) Defendants violated NEPA by failing to develop an EIS for Amendment 4. Compl. ¶¶ 70-113.

On September 9, 2011, Plaintiffs filed their Motion for Summary Judgment ("Pls.' Mot.") [Dkt. No. 17]. On October 7, 2011, Defendants filed their Opposition to Plaintiffs' Motion and Cross-

Motion for Summary Judgment ("Defs.' Mot.") [Dkt. No. 19]. On October 28, 2011, Plaintiffs filed their Reply to Defendants' Opposition and Opposition to Defendants' Motion ("Pls.' Reply") [Dkt. No. 20]. On November 18, 2011, Defendants filed their Reply to Plaintiffs' Opposition ("Defs.' Reply") [Dkt. 22]. On January 4, 2012, oral argument on the cross-motions was heard by this Court. On January 11, 2012, with the Court's permission, Defendants and Plaintiffs filed respective Supplemental Memoranda ("Defs.' Supp. Mem." and "Pls.' Supp. Mem.") [Dkt. Nos. 27 and 28].

## II.  STANDARD OF REVIEW

Summary judgment will be granted when there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(c). Because this case involves a challenge to a final administrative decision, the Court's review on summary judgment is limited to the Administrative Record. Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)); Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.").

Agency decisions under the Magnuson-Stevens Act and NEPA are reviewed pursuant to Section 706(2) of the APA. 16 U.S.C. § 1855(f)(1)(B) ("the appropriate court shall only set aside" actions under the MSA "on a ground specified in [5 U.S.C. §§] 706(2)(A),

11

(B), (C), or (D).”); <u>Oceana, Inc. v. Locke</u>, ___F.3d___, No. 10-5299, 2011 WL 2802989, at *2 (D.C. Cir. July 19, 2011); <u>C&W Fish</u>, 931 F.2d at 1562; <u>Oceana v. Locke</u>, ___F. Supp. 2d___, No. 10-744 (JEB), 2011 WL 6357795, at *8 (D.D.C. Dec. 20, 2011). In relevant part, 5 U.S.C. § 706(2) requires a court to hold agency action unlawful if it is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.”

The arbitrary and capricious standard of the APA is a narrow standard of review. <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971). It is well established in our Circuit that the “court’s review is . . . highly deferential” and “we are ‘not to substitute [our] judgment for that of the agency’ but must ‘consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.’” <u>Bloch v. Powell</u>, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (quoting <u>S. Co. Servs., Inc. v. FCC</u>, 313 F.3d 574, 579-80 (D.C. Cir. 2002)); <u>see</u> <u>also</u> <u>United States v. Paddack</u>, 825 F.2d 504, 514 (D.C. Cir. 1987). However, this deferential standard cannot permit courts “merely to rubber stamp agency actions,” <u>NRDC v. Daley</u>, 209 F.3d 747, 755 (D.C. Cir. 2000), nor be used to shield the agency’s decision from undergoing a “thorough, probing, in-depth review.” <u>Midtec Paper Corp. v. United States</u>, 857 F.2d 1487, 1499 (D.C. Cir. 1988) (internal citations and quotations omitted).

An agency satisfies the arbitrary and capricious standard if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); Lichoulas v. FERC, 606 F.3d 769, 775 (D.C. Cir. 2010). Finally, courts "do not defer to the agency's conclusory or unsupported suppositions." McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1186-87 (D.C. Cir. 2004).

## III. ANALYSIS

### A.   Standing

Defendants argue that Plaintiffs' suit must be dismissed because they lack Article III standing. Defs.' Mot. 13-15. The doctrine of standing reflects Article III's "fundamental limitation" of federal jurisdiction to actual cases and controversies. Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). The doctrine "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of federal-court jurisdiction.'" Id. (quoting Warth v. Seldin, 422 U.S. 490, 498-99 (1975)) (emphasis on "his" in original).

To obtain the injunctive relief they seek, Plaintiffs must show that (1) they have "suffered an 'injury in fact' that is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000); see also Summers, 555 U.S. at 493; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Shays v. FEC, 414 F.3d 76, 83 (D.C. Cir. 2005). Defendants contend that Plaintiffs have failed to demonstrate that their alleged injury is "imminent" or "traceable." Defs.' Mot. 13. They have not challenged any of the other requirements for standing.

### 1.   Injury in Fact--Imminence

Plaintiffs claim that they are harmed (1) because they are unable to fish for or observe river herring and (2) because, due to the decline of river and Atlantic herring as forage, they are less able to fish for or observe striped bass. Flaherty Decl. ¶¶ 2, 4-5, 12-13; Hastbacka Decl. ¶¶ 6-9, 14-16; Moir Decl. ¶¶ 14, 16-17 [Dkt. No. 17-2]. Defendants argue that the injury associated with striped bass is not actual or imminent because Plaintiffs have failed to assert that they are "actually unable to fish for striped bass as a result of NMFS' actions." Defs.' Mot. 13 (emphasis in original).

Defendants are incorrect. Captain Alan Hastbacka has asserted that the fish his clients target, which include striped bass, are "more abundant, bigger, and healthier" when "there are adequate

forage fish" and that he can "sell more tackle . . . when the fishing is good." Hastbacka Decl. ¶ 6. During at least one fishing season, the fish targeted by Captain Hastbacka and his clients, including striped bass, disappeared when the Atlantic herring stock in the area was depleted. Id. ¶ 9. Michael Flaherty similarly states that "Defendants' failures challenged in this case . . . negatively impact the health and population levels of the striped bass I fish for." Flaherty Decl. ¶ 12.

In other words, Plaintiffs claim that their ability to fish striped bass for sport or business has been, and will continue to be, harmed by the state of the Atlantic herring fishery because adequate conservation measures to protect the herring upon which striped bass feed have not been adopted. See, e.g., N.C. Fisheries Ass'n, Inc. v. Gutierrez, 518 F. Supp. 2d 62, 82 (D.D.C. 2007) (economic harm "is a canonical example of injury in fact sufficient to establish standing.") (citing Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 704 (D.C. Cir. 1988)).

Indeed, Defendants themselves have amply made the point that Atlantic herring serve as an important forage species for striped bass and other ocean predators. AR 6111. In its analysis of Amendment 4, the Council stated that its actions "should acknowledge the role that Atlantic herring plays in the Northwest Atlantic ecosystem and address the importance of herring as a forage species for many fish stocks, marine mammals, and seabirds."

Id. According to the Council, "[o]ne of the objectives of this amendment . . . is . . . to consider the health of the herring resource and the important role of herring as a forage fish." Id. at 6111-12. Hence, there is no doubt that Plaintiffs face imminent harm to their interests in striped bass, should Defendants fail to properly manage Atlantic herring.

Defendants attempt to analogize this case to FCC v. Branton, 993 F.2d 906 (D.C. Cir. 1993). They argue that, "[a]s in Branton, where the plaintiff did not have standing because his injury was based on a possibility that he may someday be exposed to harm, Captain Hastbacka's concern that he may 'someday' be unable to fish for striped bass as a result of the actions that NMFS took in Amendment 4 is patently insufficient to satisfy the 'injury in fact' requirement." Defs.' Mot. 13-14.

Defendants' analysis is not convincing. Branton pointed out that "[i]n order to challenge official conduct one must show that one 'has sustained or is immediately in danger of sustaining some direct injury' in fact as a result of that conduct." 993 F.2d at 908 (quoting Golden v. Zwickler, 394 U.S. 103, 109 (1969)). The plaintiff in Branton alleged "that he was injured because he was subjected to indecent language over the airwaves" on one past occasion. Id. at 909. Our Court of Appeals held that "a discrete, past injury cannot establish the standing of a complainant . . . who seeks neither damages nor other relief for that harm, but

16

instead requests the imposition of a sanction in the hope of influencing another's future behavior." Id. The allegation of a single incident of indecent language is obviously very different from the ongoing scenario presented here, where Plaintiffs state that the striped bass which they and their clients fish and observe are now and will in the future be threatened by overfishing of the Atlantic and river herring.

Plaintiffs in this case have alleged continuous and ongoing harm to their ability to fish for species dependant on the Atlantic and river herring. The harm to striped bass stemming from improper regulation of forage fish presents a concrete explanation for how Plaintiffs will be injured by Defendants' actions. Lujan, 504 U.S. at 564; N.C. Fisheries Ass'n, 518 F. Supp. 2d at 81 (in addressing the injury in fact prong, "courts ask simply whether the plaintiff has 'asserted a present or expected injury that is legally cognizable and non-negligible.'") (quoting Huddy v. FCC, 236 F.3d 720, 822 (D.C. Cir. 2001)).

### 2.   Traceability

Defendants next argue that Plaintiffs' injuries are not traceable to Amendment 4 because they "occurred long before NMFS issued the final rule implementing Amendment 4" and "because they concern species beyond the scope of the Amendment." Defs.' Mot. 14.

The first argument is easily disposed of. As explained above, Plaintiffs have stated that they continue to suffer from the

depletion of river herring stocks and from the negative impact that depletion of river and Atlantic herring has on striped bass. See supra Part III.A.1; Hastbacka ¶¶ 6, 9; Flaherty Decl. ¶ 12. Plaintiffs need demonstrate neither proximate causation nor but-for causation to establish traceability; they must only show that "'the agency's actions materially increase[d] the probability of injury.'" N.C. Fisheries Ass'n, 518 F. Supp. 2d at 83 (quoting Huddy, 236 F.3d at 722); see also Nat'l Audubon Soc'y v. Davis, 307 F.3d 835, 849 (9th Cir. 2002) (to be "fairly traceable," chain of causation must be plausible). Again, Defendants themselves have acknowledged the chain of causation between under-regulation of herring fishing and the abundance and health of predator fish. AR 6111-12. Plaintiffs' contention that Defendants' choices in Amendment 4 will materially increase the probability of their injury is far more than merely plausible.

Further, taken to its logical conclusion, Defendants' argument would preclude anyone from challenging FMPs, since the decline of the nation's fisheries began before the MSA was enacted with the purpose of stopping that deterioration. See 16 U.S.C. § 1801(b)(1). Therefore, the fact that the injuries may have begun before issuance of Amendment 4 is no obstacle to Plaintiffs' standing.

Defendants' next argument is no more persuasive. As to river herring, the claim that Plaintiffs' injury cannot be traced to Amendment 4 because Amendment 4 does not address management of

river herring is plainly circular when the essence of Plaintiffs' challenge is to Defendants' substantive decision not to include that species. Plaintiffs claim that Defendants' decision not to manage river herring violated the MSA and APA. The harm caused by depletion of river herring by commercial fishing is clearly traceable to Defendants' decision not to restrict river herring catch. Moreover, there is no doubt that increased regulation of river herring catch would contribute to the rebuilding of that stock. Branton, 993 F.2d at 910 (traceability and redressability "tend to merge . . . in a case such as this where the requested relief consists solely of the reversal or discontinuation of the challenged action.") (citing Allen v. Wright, 468 U.S. 737, 759 n.24 (1984)).

As to striped bass, the fact that Amendment 4 does not specifically regulate striped bass is of no moment. As previously explained, Plaintiffs have articulated a perfectly plausible explanation for how harm to their ability to fish or observe striped bass is traceable to Defendants' claimed deficiencies in regulating herring. N.C. Fisheries Ass'n, 518 F. Supp. 2d at 83.

In short, Plaintiffs have shown a causal connection between Defendants' regulatory choices in Amendment 4 and the health of river herring and striped bass stocks. Further, Plaintiffs have demonstrated that (1) they have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Friends of the Earth</u>, 528 U.S. at 180-81. They therefore have standing to challenge Amendment 4.

**B.    Stocks in the Fishery**

Plaintiffs challenge Defendants' decision to approve Amendment 4 because the Amendment includes only Atlantic herring, and excludes river herring, as a stock in the fishery. Once a fish is designated as a "stock in the fishery," the Council must develop conservation and management measures, including ACLs and AMs, for that stock. Pls.' Mot. 14; 16 U.S.C. § 1853(a). Hence, the Atlantic Herring FMP includes no protective measures for river herring.

As described above, the MSA requires the Council to prepare an FMP "for each fishery under its authority that requires conservation and management." 16 U.S.C. § 1852(h)(1). The Act defines a "fishery" as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics." <u>Id.</u> § 1802(13). A "stock of fish" is "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit." <u>Id.</u> § 1802(42). The Council determines which "target stocks" (fish that are deliberately caught), and/or "non-target stocks"

(fish that are incidentally caught), to include in the fishery. 50 C.F.R. § 600.310(d)(1).

In other words, in developing an FMP, the Council must decide which species or other categories of fish are capable of management as a unit, and therefore should be included in the fishery and managed together in the plan. This decision entails two basic determinations. The Council must decide (1) which stocks "can be treated as a unit for purposes of conservation and management" and therefore should be considered a "fishery" and (2) which fisheries "require conservation and management." 16 U.S.C. §§ 1802(13), 1852(h)(1). The Council must then set ACLs and AMs for all stocks in the fishery. Id. § 1853(a)(15). After the Council completes its proposed plan or amendment, NMFS must review it for compliance with applicable law and standards. Id. § 1854(a)(1)(A).

Plaintiffs contend that Amendment 4 contravenes the Act's requirements by failing to include river herring as a stock in the Atlantic herring fishery. Pls.' Mot. 15. Consequently, Plaintiffs argue, Defendants have violated the MSA and APA by erroneously concluding that Amendment 4 comports with the provisions of the MSA. Pls.' Mot. 20; see also 16 U.S.C. § 1854(a)(1)(A) (NMFS must determine whether FMPs are consistent with provisions of MSA); N.C. Fisheries Ass'n, 518 F. Supp. 2d at 71-72 ("Secretarial review of a FMP or plan amendment submitted by a regional council focuses on

the proposed action's consistency with the substantive criteria set forth in, and the overall objectives of, the MSA.").

The Court must now consider whether NMFS acted arbitrarily and/or capriciously in approving Amendment 4. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2). The Court's "task is not to review de novo whether the amendment complies with [the MSA's] standards but to determine whether [NMFS's] conclusion that the standards have been satisfied is rational and supported by the record." C&W Fish, 931 F.2d at 1562; see also Blue Ocean Inst. v. Gutierrez, 585 F. Supp. 2d 36, 43 (D.D.C. 2008).

Defendants argue that the Administrative Record fully supports their decision and rely on two basic rationales. First, Defendants argue that, because of the imminence of the 2011 statutory deadline for completion of Amendment 4, the decision to postpone consideration of inclusion of river herring in the fishery until development of Amendment 5 was reasonable. Second, Defendants argue that NMFS properly deferred to the Council's determination as to the makeup of the fishery.

### 1.   Delay Due to Statutory Deadline

Defendants first point to the pressure imposed by the MRSA's deadline. Defendants state that, in June 2009, they determined that consideration of measures specifically designed to protect river herring should be delayed so that they could meet the 2011 statutory deadline for providing measures to protect Atlantic

herring. Defs.' Mot. 17, 38; see AR 6325-26 ("In June 2009, the Council determined there was not sufficient time to develop and implement all the measures originally contemplated in Amendment 4 by 2011, so it decided that Amendment 4 would only address ACLs and AMs requirements and specification issues."). Defendants' logic was that because time was limited and the MSA required ACL and AM rules for all stocks in the fisheries and Atlantic herring had already been identified as a stock in the fishery, they could best comply with the MSA by formulating only the Atlantic herring regulations and postponing consideration of regulations for the management of river herring. See Pub. L. No. 109-479, § 104(b), 120 Stat. 3575, 3584 (requiring that FMPs including processes for setting ACLs and AMs take effect "in fishing year 2011 for all . . . fisheries" not determined to be overfished, including the Atlantic herring fishery).

While it is correct that the MRSA did impose the 2011 deadline, Defendants fail to provide any explanation or analysis from which the Court can conclude that the delay in considering the composition of the fishery, which entailed exclusion of river herring, was reasonable. McDonnell Douglas Corp., 375 F.3d at 1186-87 ("we do not defer to the agency's conclusory or unsupported suppositions."). The MSRA was signed at the beginning of 2007. Defendants identify nothing in the Administrative Record that explains why, when the Council had more than four years to meet the

statutory deadline for fishing year 2011, it could not address whether river herring, in addition to Atlantic herring, were in need of ACLs and AMs and still meet its deadline.

The Administrative Record discloses only vague and conclusory statements that "there was not sufficient time to develop and implement all the measures originally contemplated in Amendment 4 by 2011." AR 6325; see also AR 5641. The closest Defendants come to providing a substantive explanation is to quote a slide from a January 26, 2011, meeting regarding proposed Amendment 5, which reads, "the Herring [Plan Development Team] cannot generate a precise enough estimate of river herring catch on which to base a cap." AR 5361. That document does not explain why an estimate could not have been generated prior to issuance of Amendment 4, nor why the Council could not at the very least have devised an interim Acceptable Biologic Catch control rule based on the best available science, as it did in Amendment 4 for Atlantic herring. Defendants point to no other evidence in the Administrative Record to explain why the Council was unable to address management of river herring in the four years of lead time that elapsed between the signing of the MSRA and the final promulgation of Amendment 4.

The reason that Defendants' failure matters is that the MRSA requires ACLs and AMs for all stocks in need of conservation and management, not just for those stocks which were part of the fishery prior to passage of the MRSA. Although the MRSA does not

explicitly require the Council to reassess the makeup of the fishery, it does require the Council and NMFS to set ACLs and AMs by 2011 "such that overfishing does not occur in the fishery." 16 U.S.C. § 1853(a)(15). The setting of ACLs and AMs necessarily entails a decision as to which stocks require conservation and management. Id. §§ 1802(13), 1853(a)(15). Hence, Defendants must provide some meaningful explanation as to why it was not possible to consider which stocks, other than Atlantic herring, should be subject to the ACLs and AMs which are so central to effective fishery management and avoidance of overfishing. NetCoalition v. SEC, 615 F.3d 525, 539 (D.C. Cir. 2010) ("an agency may not shirk a statutory responsibility simply because it may be difficult.").

Moreover, Defendants have not explained why the information in the Administrative Record cited by Plaintiffs was deemed insufficient to justify including river herring as a stock, as urged in many comments submitted on the Proposed Regulation, or to permit setting at least an interim Acceptable Biological Catch limit for the species, just as was done for Atlantic herring. See Pls.' Mot. 18-19 (citing AR 154, 157, 315, 407, 645, 665, 755, 779, 780, 795, 903, 1257, 1288, 1506, 1978, 2550, 2571, 2602, 2806, 3789, 6341).

In short, Defendants themselves cite to no evidence or facts supporting the Council's excuse that "there was not sufficient time" to consider the fishery's composition. AR 6325; Kristin

25

Brooks Hope Ctr. v. FCC, 626 F.3d 586, 588 (D.C. Cir. 2010) ("The agency's explanation cannot 'run [] counter to the evidence,' . . . and it must 'enable us to conclude that the [agency's action] was the product of reasoned decisionmaking.'") (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 52).

While a looming statutory deadline may in some instances provide justification for an agency's delay in decision-making, it does not relieve Defendants of the duty to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"--especially when the agency was given a four-year lead time to meet that deadline and failure to meet it could have serious consequences for the species to be protected. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal quotation omitted). Defendants' conclusory statement that river herring would simply have to wait until a future amendment does not suffice. Kristin Brooks Hope Ctr., 626 F.3d at 588; McDonnell Douglas Corp., 375 F.3d at 1186-87.

### 2.   Deference to the Council

Defendants also argue that river herring were not designated as a stock in the fishery because the Council decided to include only target stocks in the fishery, and river herring is a non-target stock. Defs.' Mot. 17 (citing AR 6067). According to Defendants, NMFS deferred to the Council's decision not to include any non-target stocks in the fishery, and needed to do no more. AR

6256, 6330. The crux of Defendants' argument is that under both the structure of the MSA and the agency's own regulations, unless a species is determined by NMFS to be "overfished" or the Council's decision is in clear violation of the MSA,[5] NMFS should simply defer to the Council's determination of what stocks are in the fishery rather than conduct an independent review of whether that determination complies with the MSA's provisions and standards. Defs.' Mot. 15-16; Defs.' Reply 4-9.

### a.   Statutory Provisions

Defendants argue that the "Magnuson-Stevens Act entrusts the Councils with the responsibility to prepare FMPs for those fisheries requiring conservation and management" and that the "inclusion of a species . . . in a fishery management unit is based on a variety of judgment calls left to the Council." Defs.' Mot. 15. Defendants rely on 16 U.S.C. § 1852(h), giving the Council the responsibility to prepare and submit FMPs and amendments, and on 16 U.S.C. § 1854(e), requiring an FMP only where NMFS has determined that a fishery is "overfished." Therefore, Defendants contend, in

---

[5] Defendants have not been consistent in explaining what sort of review NMFS must apply to the Council's determination of the composition of a fishery. In their Motion, Defendants concede that NMFS must review FMPs and amendments for consistency with the National Standards and applicable law, but argue that "[t]he inclusion of a species not determined to be overfished in a fishery management unit is based on a variety of judgment calls left to the Council." Defs.' Mot. 15-16. Hence, Defendants appear to be arguing that the Council's decision to exclude a species from a fishery is unreviewable. Later, at oral argument, however, Defendants agreed that the Council's decision must not be arbitrary or capricious.

the absence of a finding of overfishing, council decisions about the make-up of a fishery are unreviewable by NMFS and are entitled to deference.

Plaintiffs view Defendants' argument as "threaten[ing] to unravel the entire fabric of the Act." Pls.' Mot. 17. They caution that, under the Defendants' interpretation of the MSA, "councils would be left with the sole discretion to include any, or no, stocks in their FMPs, regardless of whether there is scientific information demonstrating the need for their conservation and management." Id.

Defendants are correct that "it is the Council that has the responsibility to prepare the FMP in the first instance for those fisheries requiring conservation and management," which includes describing the species to be managed. Defs.' Reply 4-5 (citing 16 U.S.C. §§ 1852(h)(1), 1853(a)(2)) (emphasis in original). As explained above, except in special circumstances,[6] the council prepares and submits proposed FMPs and amendments to NMFS. 16 U.S.C. § 1852(h)(1).

What Defendants fail to fully appreciate, however, is that once the council completes its work, the MSA requires NMFS to review its plan to determine whether it comports "with the ten

_____

[6] For example, NMFS may develop its own FMP if a council fails to do so within a reasonable time for a fishery in need of conservation and management, or NMFS may order a council to take action to end overfishing and rebuild stocks if it finds that a fishery is overfished or approaching a condition of being overfished. 16 U.S.C. §§ 1854(c)(1), (e).

national standards, the other provisions of [the Act], and any other applicable law." Id. § 1854(a)(1)(A). Thus, it is Defendants' responsibility to decide whether an FMP, including the composition of its fishery, satisfies the goals and language of the MSA. N.C. Fisheries Ass'n, 518 F. Supp. 2d at 71-72 ("Secretarial review of a FMP or plan amendment submitted by a regional council focuses on the proposed action's consistency with the substantive criteria set forth in, and the overall objectives of, the MSA."). While Defendants are correct that it is the Council's role to name the species to be managed "in the first instance," it is NMFS's role, in the second instance, to ensure that the Council has done its job properly under the MSA and any other applicable law.

It is true that the MSA requires management measures when NMFS finds overfishing. But it certainly does not follow that in the absence of overfishing NMFS may simply rubber stamp the Council's decisions. Section 1854(a) is clear: NMFS must examine whether the FMP "is consistent with the national standards, the other provisions of [the MSA], and any other applicable law." 16 U.S.C. § 1854(a)(1)(A). While NMFS may defer to the Council on policy choices, the Act plainly gives NMFS the final responsibility for ensuring that any FMP is consistent with the MSA's National Standards, and "the overall objectives" of the Act. N.C. Fisheries Ass'n, 518 F. Supp. 2d at 71-72.

Defendants' responsibilities therefore include ensuring compliance with Section 1852(h)'s requirement that the Council prepare an FMP or amendment for any stock of fish that "requires conservation and management." 16 U.S.C. § 1852(h)(1). That Section requires FMPs and necessary amendments for all "stocks of fish which can be treated as a unit for purposes of conservation and management" and which are in need of conservation and management. Id. §§ 1802(13)(a), 1852(h)(1). Thus, NMFS must make its own assessment of whether the Council's determination as to which stocks can be managed as a unit and require conservation and management is reasonable. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 52 ("agency's explanation . . . [must] enable us to conclude that [its decision] was the product of reasoned decisionmaking.").

There is no basis for concluding, as Defendants do, that the structure of the MSA weakens Section 1854's command that NMFS review proposed plans and amendments for compliance with the statute. The standards to be applied in reviewing NMFS's conclusion that Amendment 4 complies with Section 1852(h) are therefore no different than review of NMFS's conclusion that an amendment complies with the National Standards. See N.C. Fisheries Ass'n, 518 F. Supp. 2d at 71-72 ("Secretarial review of a FMP or plan amendment submitted by a regional council focuses on the proposed action's consistency with the substantive criteria set forth in, and the overall objectives of, the MSA."). Merely deferring to the

30

Council's exclusion of non-target species like river herring
without any explanation for why that exclusion complies with the
MSA fails to meet APA standards. Motor Vehicle Mfrs. Ass'n, 463
U.S. at 43 (agency must "examine the relevant data and articulate
a satisfactory explanation for its action"); Tourus Records, Inc.
v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001) ("A fundamental
requirement of administrative law is that an agency set forth its
reasons for decision; an agency's failure to do so constitutes
arbitrary and capricious agency action.") (internal quotations
omitted).

### b.   Defendants' Regulation

National Standard 1 of the MSA states, "Conservation and
management measures shall prevent overfishing while achieving, on
a continuing basis, the optimum yield from each fishery for the
U.S. fishing industry." 16 U.S.C. § 1851(a)(1). Defendants cite to
50 C.F.R. § 600.310(d)(1), which interprets that Standard, and
states: "[t]he relevant Council determines which specific target
stocks and/or non-target stocks to include in a fishery." According
to Defendants, this provision justifies NMFS's failure to explain
why the Council's decision comports with the MSA. Defs.' Mot. 15.

However, Section 1854 states in no uncertain language that
NMFS must "determine whether [the plan or amendment] is consistent
with the national standards, the other provisions of this chapter,
and any other applicable law." 16 U.S.C. § 1854(a)(1)(A). A mere

31

regulation can never override a clear Congressional statutory command--i.e., that NMFS shall review FMP amendments for compliance with all provisions of the MSA. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984); Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007). Nor, it should be noted, need 50 C.F.R. § 600.310(d)(1) be interpreted as Defendants do. It is absolutely correct that under the MSA, the councils do have the responsibility to determine what stocks to include in the fishery. But that is not the end of the process. After the councils make their determination, NMFS must still make its final compliance review.

Simply put, 50 C.F.R. § 600.310(d)(1) cannot be understood to permit NMFS to ignore its duty to ensure compliance with the MSA. The councils do not have unlimited and unreviewable discretion to determine the make-up of their fisheries.

Therefore, Defendants were required to review Amendment 4 for compliance with the MSA. Defendants need not prove that the decision to designate only target stocks as stocks in the fishery was the best decision, but they must demonstrate that they reasonably and rationally considered whether Amendment 4's definition of the fishery complied with the National Standards and with the MSA's directive that FMPs be generated for any fisheries requiring conservation and management. Mere deference to the Council, with nothing more, does not demonstrate reasoned decision-

making. <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 56 (agency's decision was arbitrary and capricious because it failed to analyze the issue); <u>Am. Equity Inv. Life Ins. Co. v. SEC</u>, 613 F.3d 166, 179 (D.C. Cir. 2010) (same); <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 772 F.2d 1043, 1051 (2d Cir. 1985) ("agency's action is held to be arbitrary and capricious when it . . . utterly fails to analyze an important aspect of the problem.").

### C. **Bycatch**

Plaintiffs also contend that Amendment 4 fails to minimize bycatch, in violation of National Standard 9. 16 U.S.C. § 1851(a)(9). "Bycatch" refers to "fish which are harvested in a fishery, but which are not sold or kept for personal use" including "economic discards and regulatory discards." <u>Id.</u> § 1802(2). In other words, fish incidentally caught in a trawler's net and then later thrown away are bycatch. "In simple terms, bycatch kills fish that would otherwise contribute toward the well-being of the fishery or the nation's seafood consumption needs." <u>Conservation Law Found. v. Evans</u>, 209 F. Supp. 2d 1, 14 (D.D.C. 2001).

The Final Rule implementing Amendment 4 addresses bycatch in one sentence: "[b]ycatch in the herring fishery will continue to be addressed and minimized to the extent possible, consistent with other requirements of the MSA." 76 Fed. Reg. 11373, 11374; AR 6326. Plaintiffs argue that this one sentence is insufficient under the MSA, because the Act "requires that all FMPs and FMP amendments

33

contain concrete conservation and management measures to minimize bycatch and bycatch mortality to the extent practicable." Pls.' Mot. 21. Defendants respond that (1) Plaintiffs have waived their claim under National Standard 9 by failing to raise an objection during the administrative process; and (2) the Council and NMFS have sufficiently minimized bycatch based on the best available science. Defs.' Mot. 19-21.

Defendants' first argument is, to put it mildly, hyper-technical, and without merit. Defendants concede that Plaintiffs did comment on bycatch during the administrative process, but only before Defendants issued their second Notice of Intent, limiting Amendment 4's scope to addressing ACLs and AMs for Atlantic herring. Defs.' Reply 10. Nonetheless, Defendants contend that Plaintiffs' failure to raise the issue again, after NMFS announced that Amendment 4 would proceed in its reduced form, bars them from bringing the claim. Id. That is, Defendants argue that Plaintiffs waived their bycatch claim by not raising it a second time, after Defendants had already made clear that they would not consider bycatch in Amendment 4.

This argument finds no support in caselaw--nor for that matter in fundamental fairness. Certainly it is true "that a party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration." Advocates for Highway & Auto Safety v. Fed.

34

Motor Carrier Safety Admin., 429 F.3d 1136, 1150 (D.C. Cir. 2005). But Defendants cite no authority requiring parties to raise the ground repeatedly after the agency has rejected their suggestion or after each new version of the proposed action is issued.

Moreover, by raising the bycatch issue before Amendment 4 was reduced in scope, Plaintiffs clearly satisfied the purposes of this issue waiver rule. Plaintiffs "'alert[ed] the agency to [their] position and contentions,' in order to allow the agency to give the issue meaningful consideration." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004) (quoting Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553 (1978)); see also Advocates for Highway & Auto Safety, 429 F.3d at 1150 (the two reasons for an "issue exhaustion" or "issue waiver" rule are that (1) "the role of the court is to determine whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking" and (2) "'[s]imple fairness . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body . . . has erred against objection made at the time appropriate under its practice.'") (quoting United States v. L.A. Trucker Lines, Inc., 344 U.S. 33, 37 (1952)). Consequently, the Court concludes that Plaintiffs have not waived their claim under National Standard 9.

Defendants' second argument is more substantive. They contend that, in fact, they have satisfied their responsibility to minimize bycatch to the extent practicable.

National Standard 9 requires that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9). While each FMP must attempt to minimize bycatch to the extent practicable, it must also "balance competing environmental and economic considerations" as embodied in the ten National Standards. Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 157 (D.D.C. 2005); Pacific Coast Fed'n of Fishermen's Ass'n v. Locke, No. C 10-04790 CRB, 2011 WL 3443533, at *9 (N.D. Cal. Aug. 5, 2011). Nonetheless, to meet their responsibility to ensure compliance with the National Standards, Defendants must demonstrate that they have evaluated whether the FMP or amendment minimized bycatch to the extent practicable. Conservation Law Found., 209 F. Supp. 2d at 14.

Defendants argue that they have met this burden because the FMP as a whole minimizes bycatch.[7] Defs.' Mot. 20-21. Defendants

---

[7] Defendants make much of the distinction that "as a legal matter, the Magnuson-Stevens Act requires that the overall fishery management plan be consistent with National Standard 9--not that each separate amendment contain measures to minimize bycatch." Defs.' Mot. 20 (citing 16 U.S.C. § 1851(a)(9)) (emphasis in original). While it may be correct that Amendment 4's compliance with National Standard 9 should be viewed in the context of the entire FMP, it is also clear, as discussed earlier, that NMFS was required to review Amendment 4 "to determine whether it is
(continued...)

point to (1) Amendment 1 to the FMP, which "prohibits midwater trawling vessels from fishing in a designated area for Atlantic herring from June 1 to September 30 of each year," (2) the haddock incidental catch cap, which addresses haddock bycatch and was developed through Framework 43 of the Northeast Multispecies FMP,[8] and (3) the limits generally placed on the herring fishery by the interim ABC control rule. Id. None of these three examples demonstrate that Defendants undertook any effort to consider whether Amendment 4, or the FMP as amended by Amendment 4, minimized bycatch to the extent practicable.

The first measure identified by Defendants, Amendment 1, simply bans use of midwater trawling vessels in one of the Atlantic herring fishery's four management areas for four months of the year. 72 Fed. Reg. 11252, 11257 (Mar. 12, 2007). While this rule, issued in March of 2007, does reduce the use of a type of boat that causes substantial bycatch, it does so for only four months per year in only one management area. The second measure, the haddock

---

[7] (...continued)
consistent with the national standards." 16 U.S.C. § 1854(a)(1)(A). Hence, NMFS's review of Amendment 4 had to include some analysis of whether the FMP minimized bycatch "to the extent practicable." Id. § 1851(a)(9). As discussed at length below, Defendants have identified nothing in the Administrative Record demonstrating such examination.

[8] The haddock incidental catch cap specifies an "incidental haddock catch allowance" for the season for the herring fishery. AR 6153. In simple terms, when a vessel has reached the allowance for incidental haddock catch, it is prohibited from fishing for, possessing, or landing more than 2,000 pounds of herring per trip for the rest of the year. Id.

incidental catch cap, which was issued as part of the Northeast Multispecies FMP, only considers haddock bycatch, and gives no incentive for minimizing bycatch of other species, such as river herring. AR 6153. Finally, the third measure is merely the limits on Atlantic herring catch and in no way limits fishing to minimize river herring or other bycatch. Thus, this measure only has the ancillary benefit of reducing bycatch and bycatch mortality of river herring and other fish by generally limiting the amount of fishing in the Atlantic herring fishery.

The existence of an earlier rule to reduce bycatch and two measures that, at best, have only an incidental effect on bycatch does not show that NMFS ever considered the significant issue of whether the Atlantic Herring FMP minimizes bycatch or bycatch mortality to the extent practicable based on the best available science. 16 U.S.C. §§ 1851(a)(2), (9). While each of these three measures may have some impact on total bycatch in the Atlantic herring fishery, none of them indicate that Defendants have considered the issue in any substantive manner.

Defendants also quote from two sections of Amendment 4 that discuss bycatch. First, Defendants point to the section of the Council's substantive analysis of Amendment 4 that ostensibly discusses National Standard 9. Defs.' Mot. 20-21. This single paragraph explains that "the Council made the decision to include only [Atlantic] herring as a stock with the knowledge that other

mechanisms exist to deal with non-targets [sic] species caught,"
and "one of the objectives of Amendment 5 to the Atlantic Herring
FMP, which is under development, is to develop a program which
effectively and efficiently monitors bycatch and potentially acts
to reduce it." AR 6087. "The amendment therefore specifies that
bycatch is to be monitored and minimized accordingly."[9] Id. If

_____

[9] The paragraph in full reads:

> National Standard 9 states that bycatch must
> be minimized and that mortality of such
> bycatch must be minimized. As such, the
> Council made the decision to include only
> herring as a stock with the knowledge that
> other mechanisms exist to deal with
> non-targets [sic] species caught by the
> herring fishery. The amendment therefore
> specifies that bycatch is to be monitored and
> minimized accordingly. This amendment also
> includes the haddock catch cap, being
> implemented as an AM, which is another way in
> which bycatch is considered and minimized
> without the haddock stock being defined as a
> part of the fishery. Furthermore, one of the
> objectives of Amendment 5 to the Atlantic
> Herring FMP, which is under development, is to
> develop a program which effectively and
> efficiently monitors bycatch and potentially
> acts to reduce it with collaboration from the
> fishing industry. The measure maximizes the
> flexibility provided to the Council so that it
> can utilize the best scientific information
> available at the time when the new amendment
> is implemented. For these reasons the Council
> decided that until such time that evidence is
> brought to the Council which indicates that
> another species needs to be added to the
> definition of a stock within the herring FMP
> in order to be managed acceptably, Atlantic
> herring will be the only defined stock in the
> fishery.

(continued...)

anything, this statement makes it clear that neither the Council nor NMFS made any effort to consider whether bycatch was minimized to the extent practicable. 16 U.S.C. § 1851(a)(9).

Second, Defendants point to the section of their analysis of the "Environmental Impacts of Management Alternatives" dealing with the "Impacts on Non-target Bycatch Species." AR 6193-95. Defendants quote: "Amendment 4 'limit[s] the catch of non-target/bycatch species, particularly through the limit to the fishery placed by the interim ABC control rule.'" Defs.' Mot. 20-21 (quoting AR 6193). In context, all that the document actually says is that, because of Amendment 4's interim limits on the total catch allowed for Atlantic herring, there will be less incidental catch of non-target species than under "the no action alternative." AR 6193-94. Again, this conclusion does not reflect any examination or consideration of whether the FMP, as amended, actually minimizes bycatch to the extent practicable. 16 U.S.C. § 1851(a)(9).

Finally, Defendants state that they chose to defer consideration of National Standard 9 due to the 2011 statutory deadline for Amendment 4. Defs.' Mot. 21. For the reasons discussed at length above, supra Part III.B.1., this rationale does not suffice to demonstrate reasoned analysis of the bycatch issue. In sum, there is no evidence that the agency "thoroughly reviewed the relevant scientific data on bycatch and consulted with participants

---

[9](...continued)
AR 6087.

in the fishery to determine whether the proposed regulations would be effective and practical," as they must do to satisfy their responsibilities to ensure compliance with the National Standards. Ocean Conservancy, 394 F. Supp. 2d at 159; Conservation Law Found., 209 F. Supp. 2d at 14. Therefore, Defendants' approval of Amendment 4, without addressing the minimization of bycatch to the extent practicable, was in violation of the MSA and APA.

### D.   ACLs for Atlantic Herring

Plaintiffs claim that Amendment 4's annual catch limit ("ACL")[10] for Atlantic herring violates the MSA because it fails to prevent overfishing and is not based upon the best available science. 16 U.S.C. §§ 1851(a)(1), (2). As detailed above, the MRSA significantly enlarged the Council's and NMFS's duties by requiring all FMPs to include "a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery." Id. § 1853(a)(15). The new ACLs are to set specific limits on the total fish caught in each fishery.

The setting of an ACL entails a rather laborious process intended to generate a scientific basis for the final catch limit. First, the Council must define an overfishing limit ("OFL"), which, to simplify, is an estimate of the rate of fishing at which a

_____

[10] Amendment 4 permits the Council to establish both an overall ACL for the Atlantic herring fishery, and sub-ACLs for specific management areas. AR 6072-73, 6090.

fishery will not be sustainable.[11] 50 C.F.R. §§ 600.310(e)(1)(i)(A)-(2)(i)(E).

Second, the Council must determine the acceptable biological catch ("ABC"), which is the amount of fish that may be caught without exceeding the overfishing limit, after taking into account scientific uncertainty. Id. § 600.310(f)(2)(ii). In order to set the ABC, the Council must first establish an "ABC control rule," which explains how the Council will account for scientific uncertainty when setting the ABC. 50 C.F.R. § 600.310(f)(4). The objective of the ABC control rule is to create a buffer between OFL and ABC so that there is a low risk that OFL will be exceeded. See id. §§ 600.310(b)(v)(3), (f)(4).

Third, and finally, the Council must set the ACL, which is the amount of fish that may be caught without exceeding the ABC, after taking into account management uncertainty, such as late reporting,

---

[11] Even this first step entails a number of complex and technical calculations and analyses. For example, in order to determine an OFL, one must, among other things, consider (1) the Maximum Sustainable Yield ("MSY"), defined as "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics . . . , and the distribution of catch among fleets," (2) the MSY fishing mortality rate ("$F_{msy}$"), defined as "the fishing mortality rate that, if applied over the long term would result in MSY," and (3) the MSY stock size ("$B_{msy}$"), defined as "the long-term average size of the stock or stock complex, measured in terms of spawning biomass or other appropriate measure of the stock's reproductive potential that would be achieved by fishing at $F_{msy}$." 50 C.F.R. § 600.310(e)(1)(i).

misreporting, and underreporting of catch.[12] Id. § 600.310(f)(1). In mathematical terms, the entire process can be described as OFL≥ABC≥ACL. AR 6061. In plain English, the ABC must be equal to or less than OFL, to account for scientific uncertainty, and the final ACL must be equal to or less than ABC, to take into account management uncertainty. 50 C.F.R. §§ 600.310(e)-(f).

Further, each council must establish a scientific and statistical committee ("SSC"), whose members must include Federal and State employees, academicians, or independent experts with "strong scientific or technical credentials and experience." 16 U.S.C. §§ 1852(g)(1)(A), (C). The SSC provides "ongoing scientific advice" for fishery management decisions, including the setting of ABC and OFL. Id. § 1852(g)(1)(B). In particular, the Council must create its ABC control rule based on scientific advice from the SSC. 50 C.F.R. § 600.310(f)(4). Additionally, ACLs "may not exceed the fishing level recommendations" of the Council's SSC. 16 U.S.C. § 1852(h)(6). To summarize, in the process of setting the final ACL, the council must solicit scientific advice from the SSC and, based on that advice, establish a rule for acceptable biological catch to account for scientific uncertainty, and then set an ACL that permits no greater fishing levels than the SSC recommends.

---

[12] Again, the Court must emphasize that even this complex explanation, abridged for the purposes of comprehension, omits details of the considerably more complicated process. See 50 C.F.R. § 600.310(f).

Finally, ACLs must, of course, be consistent with the National Standards. Id. § 1853(a)(1)(C). Plaintiffs argue that the Atlantic herring ACL fails to comply with National Standards 1 and 2. National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." Id. § 1851(a)(1). Hence, they argue, NMFS's conclusion that the Atlantic herring ACL prevents overfishing while achieving optimum yield must be "rational and supported by the record." C&W Fish, 931 F.2d at 1562; Blue Ocean Inst., 585 F. Supp. 2d at 43.

National Standard 2 instructs, "[c]onservation and management measures shall be based upon the best scientific information available." Id. § 1851(a)(2). National Standard 2 "requires that rules issued by the NMFS be based on a thorough review of all the relevant information available at the time the decision was made . . . and insures that the NMFS does not 'disregard superior data' in reaching its conclusions." Ocean Conservancy, 394 F. Supp. 2d at 157 (quoting Building Indus. Ass'n v. Norton, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001)).

This rule "is a practical standard requiring only that fishery regulations be diligently researched and based on sound science." Ocean Conservancy, 394 F. Supp. 2d at 157. Further, "[c]ourts give a high degree of deference to agency actions based on an evaluation

of complex scientific data within the agency's technical expertise." Am. Oceans Compaign v. Daley, 183 F. Supp. 2d 1, 4 (D.D.C. 2000) (citing Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103 (1983)). Therefore, "[l]egal challenges to the Secretary's compliance with National Standard 2 are frequent and frequently unsuccessful" and Plaintiffs face a "high hurdle." N.C. Fisheries Ass'n, 518 F. Supp. 2d at 85.

Amendment 4's ABC control rule, which is intended to account for scientific uncertainty, sets the ABC for Atlantic herring at the three-year average annual catch measured from 2006-2008, or at 106,000 metric tons ("mt"). AR 6068-69. In other words, the ACL for Atlantic herring will be equivalent to the average yearly catch from 2006 to 2008, minus a buffer for management uncertainty. Plaintiffs argue that this ABC control rule violates National Standards 1 and 2. Plaintiffs claim that using this three-year average, without any further discount to reflect scientific uncertainty, will not prevent overfishing and is not based on the best available science.[13] Pls.' Mot. 22-27.

---

[13] Plaintiffs also object to Defendants' adoption of an "Interim" ABC control rule. Pls.' Mot. 22. Defendants correctly point out that "nothing in the MSA . . . precludes the use of an interim rule" and, of course, all ABC control rules are interim in the sense that the agency can, and should, revise their rules as superior or more recent information becomes available. Defs.' Mot. 25 (emphasis in original). Perhaps most importantly, the decision to label the rule "interim" with the expectation that the Council can develop a new control rule in the 2013-2015 herring specifications based on a 2012 stock assessment was perfectly rational and supported by the Administrative Record. C&W Fish, 931
(continued...)

To the contrary, the Administrative Record demonstrates that the Council properly considered the advice of its SSC and, after review of the best scientific information then available, selected an ABC control rule. The Administrative Record indicates that the SSC identified "considerable scientific uncertainty" in attempting to assess the size of the Atlantic herring stock, and therefore "recommended that the ABC be set based on recent catch, and asked the Council [to] determine the desired risk tolerance in setting the ABC." AR 6068. In accordance with the SSC's advice, the Council considered three options for defining recent catch: (1) the most recent, available single-year catch figure of 90,000 mt in 2008; (2) the most recent, available three-year annual average of 106,000 mt from 2006-2008; and (3) the most recent, available five-year annual average of 108,000 mt from 2004-2008. Id.

The Council ultimately decided to use the three-year catch figure to estimate ABC, based on four rationales. First, a three-year average is commonly used to estimate "recent" trends in a fishery. Id. Second, the 2008 catch "was one of the lowest on record for many years" and using the one-year estimate may fail to account for general variability in annual catch. Id. Third, because the three-year average is lower than the five-year average, it provides a more conservative estimate, and is therefore preferable in order to account for other factors, such as "the importance of

---

[13](...continued)
F.2d at 1562; see 76 Fed. Reg. 11373, 13375; AR 6088-89.

herring as a forage species." Id. Fourth, and finally, the specification of the ABC at 106,000 mt provides a 27% buffer from the maximum sustainable fishing mortality rate of 145,000 mt for 2010, in order to account for scientific uncertainty. Id. at 6069.

Plaintiffs point to no evidence that the agency ignored superior or contrary data, as they must to succeed in a National Standard 2 challenge.[14] N.C. Fisheries Ass'n, 518 F. Supp. 2d at 85. Instead, Plaintiffs protest that "Defendants arbitrarily ignored at least two approaches for setting ABC that were scientifically superior." Pls.' Reply 12. First, Plaintiffs claim that Defendants did not adopt an earlier recommendation by the SSC that the ABC control rule include a 40% buffer between OFL and ABC. Second, Plaintiffs state that Defendants refused to accept the approach they identified to set the ABC at 75% of recent average catch. Pls.' Reply 12 (citing AR 3909, 5615). But, as explained above, the Council provided perfectly rational explanations, based on the best available science, for selecting its ABC control rule, which accounted for scientific uncertainty and comported with the SSC's

---

[14] Plaintiffs claim that Defendants failed "to account for the role of forage in the ecosystem" when setting its ABC control rule. Pls.' Mot. 25-27. However, the Council's analysis of Amendment 4 states that Atlantic herring's role as a forage species was an "Important Consideration" for the SSC and Council when considering the ABC control role and definition of ABC. AR 6051-52, 6054. Indeed, the Council selected the three-year average approach in part because it felt that it best accounted for "other factors identified by the SSC, including recruitment, biomass projections, and the importance of herring as a forage species." Id. at 6088.

recommendations. AR 6088-89. National Standard 2 demands no more. Ocean Conservancy, 394 F. Supp. 2d at 157.

Nor, finally, does National Standard 1 provide any independent reason for invalidating the ABC control rule. National Standard 1 requires that "each Council must establish an ABC control rule based on scientific advice from its SSC" and that "[t]he determination of ABC should be based, when possible, on the probability that an actual catch equal to the stock's ABC would result in overfishing." 50 C.F.R. § 600.310(f)(4). The Council considered the advice of its SSC, examined several options for setting the ABC control rule, and made a reasoned determination that using the three-year average catch offered the best approach. The Court must defer to an agency's rational decision when supported by the Administrative Record, as here, and particularly when that decision involves the type of technical expertise relied upon in this case. Bloch, 348 F.3d at 1070; C&W Fish, 931 F.2d at 1562; Am. Oceans Compaign, 183 F. Supp. 2d at 4.

Although Plaintiffs may be correct that the Council could have selected a more conservative ABC control rule, which would have resulted in a more conservative ACL, Plaintiffs must do far more than simply show that Defendants did not take their preferred course of action. See N.C. Fisheries Ass'n, 518 F. Supp. 2d at 85; Am. Oceans Campaign, 183 F. Supp. 2d at 14 ("the fact that Plaintiffs would have preferred a more detailed analysis does not

compel the conclusion that the Secretary's action was arbitrary and capricious."). Plaintiffs must show "some indication that superior or contrary data was available and that the agency ignored such information." <u>N.C. Fisheries Ass'n</u>, 518 F. Supp. 2d at 85. Plaintiffs have made no showing other than that the agency did not select their favored control rule. Therefore, Defendants' adoption of Amendment 4's ABC control rule and resultant ACLs was not arbitrary and/or capricious.

### E.   AMs for Atlantic Herring

In order to enforce the new ACLs, the amended MSA requires all FMPs to include "measures to ensure accountability." 16 U.S.C. § 1853(a)(15). "AMs are management controls to prevent ACLs . . . from being exceeded, and to correct or mitigate overages of the ACL if they occur." 50 C.F.R. § 600.310(g)(1). Therefore, whenever possible, FMPs should include AMs "to prevent catch from exceeding ACLs" and "when an ACL is exceeded . . . as soon as possible to correct the operational issue that caused the ACL overage, as well as any biological consequences to the stock or stock complex resulting from the overage." <u>Id.</u> §§ 600.310(g)(2), (3).

Just like ACLs, AMs must satisfy the National Standards, including National Standard 2. As explained at greater length above, National Standard 2 "is a practical standard requiring only that fishery regulations be diligently researched and based on sound science." <u>Ocean Conservancy</u>, 394 F. Supp. 2d at 157. And of

course, "[c]ourts give a high degree of deference to agency actions based on an evaluation of complex scientific data within the agency's technical expertise." <u>Am. Oceans Compaign</u>, 183 F. Supp. 2d at 4.

Plaintiffs argue that Amendment 4's AMs are deficient for two reasons. First, Plaintiffs claim that the existing monitoring system used to detect when ACLs are reached, is insufficient. Pls.' Mot. 28-31. Second, Plaintiffs contend that the actual group of AMs included in the Atlantic herring FMP "are fundamentally flawed and insufficient to minimize the frequency and magnitude of catch in excess of the ACLs for Atlantic herring." <u>Id.</u> at 31-33. Each claim is considered in turn.

### 1.   Monitoring System

Currently, owners or operators of vessels with permits to fish for Atlantic herring are required to make a weekly report of herring they catch through an "Interactive Voice Response" ("IVR") system. 50 C.F.R. § 648.7(b)(2)(I). The reports are verified by comparing them to weekly dealer data. AR 6255. According to Defendants, "there is an incentive for fishermen to report catch accurately" "[b]ecause payment for catch is often tied to vessel/dealer reports." Defs.' Reply 17. Additionally, federal observers on board fishing boats monitor bycatch. Pls.' Mot. 9; Defs.' Reply 17. Between 2005 and 2007, the annual percentage of

trips observed ranged from 8% to 26%, for an annual average of 16%.[15] AR 653.

Plaintiffs argue that this monitoring system violates the MSA because "[a]ccurate catch limits are impossible at present in the Atlantic herring fishery because monitoring in the fishery is based heavily on unverified reports of catch and landings." Pls.' Mot. 30. Further, "accurate estimates cannot be accomplished because even on trips where a federal observer is on board the vessel, vessels are not required to bring all catch onboard [sic] for

---

[15] Plaintiffs claim that since the 1990's, "observer coverage has ranged from less than one percent of the total annual fishing trips taken in many years to roughly twenty percent in a handful of years." Pls.' Mot. 9 (citing AR 651, 653, 779). The only citation that supports this claim is a report by the Herring Alliance stating that the coverage rate "has fluctuated from 1 to 17 percent of total fishing trips since the mid-1990s, but are typically between 3 and 6 percent." AR 779. Defendants state that this report, produced by "'a coalition of environmental organizations that formed . . . to protect and restore ocean wildlife . . . by reforming the Atlantic herring fishery,'" is not peer-reviewed or approved by NMFS or the Atlantic States Marine Fisheries Commission. Defs.' Mot. 8 n.6 (quoting www.herringalliance.org/ about-our-work).

More importantly, the Herring Alliance's estimate is contradicted by the data presented by the Maine Department of Marine Resources and Massachusetts Division of Marine Fisheries. That data demonstrates that 26% of trips were covered in 2005, 14% of trips in 2006, and 8% of trips in 2007, thus supporting Defendants' claim of 16% annual coverage over the three-year period. AR 653.

Plaintiffs also claim that "NMFS has never provided observer coverage levels sufficient to derive accurate catch and bycatch estimates." Pls.' Mot. 9 (citing AR 651, 653). Although one of the slides cited contains a line reading "Low samples [sic] sizes means power to detect low," it is unclear how Plaintiffs concluded that NMFS has never been able to derive accurate catch and bycatch estimates. AR 651.

sampling and inspection" and "the ability to extrapolate catch and bycatch up to fleetwide estimates is impossible because there are insufficient observer coverage levels and at-sea dumping of unsampled catch occurs, even on otherwise observed trips." Id.

However, Plaintiffs offer no evidence to demonstrate "some indication that superior or contrary data was available and that the agency ignored such information." N.C. Fisheries Ass'n, 518 F. Supp. 2d at 85; Ocean Conservancy, 394 F. Supp. 2d at 157 (National Standard 2 requires "only that fishery regulations be diligently researched and based on sound science."). Indeed, Plaintiffs again cite no evidence in the Administrative Record to support their claims that "accurate catch limits are impossible," that "accurate estimates cannot be accomplished," or that "the ability to extrapolate catch and bycatch up to fleetwide estimates is impossible." Pls.' Mot. 30.

Rather than cite to evidence that the Council or NMFS disregarded the best available science, Plaintiffs advance two legal arguments. First, Plaintiffs claim that Defendants have admitted that the current monitoring system is inadequate. Pls.' Mot. 17. But the Administrative Record citations provided by Plaintiffs say no such thing. All that they do say is that the Council was considering measures "to improve catch monitoring." AR 5587; see also AR 380-83, 2883, 2886. The statement that monitoring could, potentially, be improved, certainly does not amount to a

concession that the current system is legally insufficient. Nor, it should be pointed out, would it benefit the notice and comment process if an agency were unable to consider possible policy improvements for fear that even soliciting comments would be considered an admission that current policies are legally inadequate.

Second, Plaintiffs claim that "vessel catch reports have been found time and again to be unreliable," citing a decision by this Court. Pls.' Reply 17. However, <u>Conservation Law Foundation</u>, the case cited by Plaintiffs, merely observed that the defendants in that case <u>conceded</u> that there were problems with their bycatch monitoring and that the New England Council's Multispecies Monitoring Committee concluded that commercial fishers unlawfully underreport bycatch. 209 F. Supp. 2d at 13, 13 n.25. Certainly, the conclusion of a different council committee, based on a separate factual record in a separate fishery, does not preclude this Council from concluding that observer coverage constitutes one of several sufficient monitoring mechanisms.

The Administrative Record contains evidence that Defendants did in fact consider Plaintiffs' comments and determined that the current monitoring system is sufficient. AR 6255, 6328. Specifically, in her "Decision Memorandum," NMFS's Regional Administrator Patricia A. Kurkul stated that, after considering comments expressing concerns regarding the monitoring, she

"conclude[d] that current reporting and monitoring is sufficient to monitor catch against ACLs/sub-ACLs." Id. at 6255. She explained that herring quotas can be monitored by weekly reports with verification by comparison to dealer reports, and stated that the agency would continue to develop improvements to the reporting system in Amendment 5. Id. While NMFS may not have performed an in-depth analysis, it reasonably relied on a policy that has been in place since 2004 and which underwent its own notice and comment process before being adopted. See 69 Fed. Reg. 13482 (Mar. 23, 2004).

Most importantly, though, Plaintiffs provide no evidence--in this case--that this longstanding monitoring system, while far from perfect, was not "diligently researched and based on sound science." Ocean Conservancy, 394 F. Supp. 2d at 157; N.C. Fisheries Ass'n, 518 F. Supp. 2d at 85. While there are serious concerns about the efficacy of the current monitoring system, see AR 651, the Court must nonetheless afford "a high degree of deference to agency actions based on an evaluation of complex scientific data." Am. Oceans Compaign v. Daley, 183 F. Supp. 2d at 4. Therefore, Plaintiffs have not demonstrated that Defendants' approval of Amendment 4's monitoring system was arbitrary and/or capricious.

## 2.   Specific Accountability Measures

Amendment 4 designates three management measures--two measures which were previously in place and one new policy--as AMs for the

Atlantic herring fishery. AR 6327; 50 C.F.R. § 648.201(a). The first AM is a management area closure device intended to prevent ACL overages. This AM prohibits vessels from catching more than 2000 lbs of Atlantic herring per day once NMFS has determined that catch will reach 95% of the annual catch allocated to the given management area. 50 C.F.R. § 648.201(a)(1). The second AM, known as the haddock incidental catch cap, attempts to prevent ACL overages by limiting Atlantic herring catch to 2000 lbs per day once NMFS has determined that the limit on incidental haddock catch has been reached. Id. § 648.201(a)(2). The third, and final, AM aims to mitigate ACL overages by deducting the amount of any overage from the relevant ACL or sub-ACL for the fishing year following NMFS's determination of the overage. Id. § 648.201(a)(3). Plaintiffs argue that each of these AMs is fundamentally flawed. Pls.' Mot. 31-33.

### a.   Management Area Closure

Plaintiffs criticize the management area closure measure because it has not always prevented ACL overages in the past. Id. at 31. Plaintiffs claim that the measure "has already proven to be ineffective," id., and that "Defendants acknowledge that [it] has already failed to work." Pls.' Reply 18. Plaintiffs erroneously characterize a more nuanced response from Defendants as a significant concession. What the Administrative Record actually demonstrates is that NMFS recognized that in 2010, a particular management area experienced an overage of 138% of its quota, but

that "[w]hen there is a pulse of fishing effort on a relatively small amount of unharvested quota . . . the chance of quota overage exists, regardless of reporting or monitoring tools."[16] AR 6328; Defs.' Mot. 28. Indeed, the Council considered this issue and concluded that, "[w]hile some overages have been experienced, the frequency and degree of overage has not been significant enough to compromise the health of the resource complex as a whole." AR 6077.

Plaintiffs nonetheless argue that the management area closure measure violates the MSA because it permits some overages despite MSA's requirements (1) that ACLs be set at levels to prevent overfishing and (2) that AMs prevent catch from exceeding ACLs. Pls.' Reply 18-19 (citing 16 U.S.C. § 1853(a)(15); 50 C.F.R. § 600.310(g)(2)).[17] This argument is unconvincing.

First, the existence of an ACL overage does not mean that overfishing is occurring. See 16 U.S.C. § 1802(34) (defining overfishing as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."). In other words, an overage does not necessarily establish that the capacity of a

---

[16] According to Defendants, there were a total of three management area overages in the four Atlantic herring management areas between 2007 and 2010. Defs.' Reply. 18, 18 n.20. In addition to the 38% overage Plaintiffs focus on, one management area experienced only a 1% overage in 2009 and another management area experienced only a 5% overage in 2010. Defs.' Reply, Ex. 2.

[17] Plaintiffs actually cite to 50 C.F.R. § 600.310(g)(3), but both the language quoted and the relevant substance is contained in § 600.310(g)(2).

fishery to produce the maximum sustainable yield on a continuing basis is being jeopardized. Indeed, the entire purpose of the process by which ACLs are generated is to create an effective buffer between ACLs and overfishing limits. See supra Part III.D.

Second, the National Standard 1 guidelines cited by Plaintiffs do not, as Plaintiffs claim, state that "NMFS must 'prevent catch from exceeding ACLs.'" Pls.' Reply 19 (quoting 50 C.F.R. § 600.310(g)(2)). The full text of that provision reads, "[w]henever possible, FMPs should include inseason monitoring and management measures to prevent catch from exceeding ACLs." 50 C.F.R. § 600.310(g)(2) (emphasis added). Indeed, these guidelines specifically require AMs that can correct ACL overages when they occur. Id. § 600.310(g)(3). Such AMs would hardly be necessary if NMFS was under an obligation to guarantee that overages never occur. In sum, Plaintiffs have not demonstrated that the one example of an admittedly very high overage in 2010 demonstrates that the use of the management area closure AM is fundamentally flawed.

### b.   Haddock Incidental Catch Cap

Plaintiffs argue that because the haddock incidental catch cap "is an accountability measure for haddock, which is managed in the Northeast Multispecies FMP," it "is irrelevant as an accountability measure for the Atlantic herring ACL." Pls.' Mot. 31. Defendants respond that, even though the cap only covers incidental catch of

haddock, it "is likely to have real benefits to the herring stock" and that "[a]ccountability measures are management tools that work together to help prevent a fishery from exceeding its ACL." Defs.' Mot. 28-29. Simply put, Plaintiffs argue that only measures designed to enforce ACLs or mitigate ACL overage can be considered AMs, while Defendants claim that any measure that might have the effect of reducing catch, and thereby helping to keep it at a level within an ACL, can constitute an AM.

Plaintiffs have the better of this argument. The statute requires, in unambiguous language, that FMPs include "measures to ensure accountability" with "annual catch limits." 16 U.S.C. § 1853(a)(15). "Accountability" means "the quality or state of being accountable, liable, or responsible." Webster's Third New International Dictionary 13 (1993). The management area closure measure discussed above clearly fits this definition: it holds fishermen and women accountable for abiding by Atlantic herring ACLs by restricting the amount of fish they catch when they get close to the limit on Atlantic herring. The haddock catch cap has no such effect. It merely holds fishermen and women accountable for incidentally catching too much haddock by limiting their ability to fish when the cap is reached. Fishermen and women may far exceed any Atlantic herring ACL and still happily fish for herring so far as the incidental haddock catch cap is concerned, as long as they have not accidentally caught too much haddock.

Hence, standing alone, the haddock incidental catch cap does not fulfill the MSA's demand that FMPs include measures to ensure accountability for ACLs. 16 U.S.C. § 1853(a)(15). Nonetheless, it should be noted that nothing prevents NMFS or the Council from considering the effect of the haddock incidental catch cap when determining whether the FMP's AMs satisfy the MSA by, <u>inter alia</u>, ensuring accountability with ACLs and preventing overfishing. <u>Id.</u> §§ 1851(a), 1853(a)(15); <u>see also</u> 50 C.F.R. § 600.310(g).

### c.   Overage Deduction

The overage deduction AM is intended to satisfy Defendants' responsiblity, when an ACL is exceeded, "as soon as possible to correct the operational issue that caused the ACL overage, as well as any biological consequences to the stock or stock complex resulting from the overage when it is known." 50 C.F.R. § 600.310(g)(3). The overage deduction AM provides that any overage in a given year is subtracted from a subsequent year's ACL or sub-ACL, so that violating catch limits in one year lowers the permissible catch in a future year. 50 C.F.R. § 648.201(a)(3). The logic of this AM is simple: the effects of catching too much fish will be corrected by reducing the amount of fish caught in the future.

Plaintiffs argue that this AM violates the mandate to correct ACL overages "as soon as possible" because the overage deduction is taken not in the fishing year immediately following the overage,

but rather in the year after. Pls.' Mot. 32; AR 6327. Defendants contend that "[i]t is not possible to require payback of overages in the next year because the final data is not available immediately." Defs.' Mot. 29.

The issue presented is whether the decision that a year-long delay is necessary was "rational and supported by the record," C&W Fish, 931 F.2d at 1562, and was "diligently researched and based on sound science." Ocean Conservancy, 394 F. Supp. 2d at 157. In response to concerns over the delay, NMFS explained that "[t]he herring fishing year extends from January to December." AR 6328. Because the "fishery can be active in December," "information on bycatch of herring in other fisheries is not finalized until the spring of the following year," and NMFS must "provide sufficient notice to the industry," the overage deduction cannot be taken in the year immediately following the year of the overage. Id. That is, Defendants just do not have all the necessary information nor the necessary time to calculate overages when one fishing year ends in December and the next begins in January.[18]

In addressing the issue, the Council and NMFS did consider the impact of the delay on the fishery. The Final Rule explains that "[h]erring is a relatively long-lived species (over 10 years) and multiple year classes are harvested by the fishery." Id. "These

---

[18] Defendants also point out in their briefing that "Federal dealer data is not finalized until the spring of the following year and state dealer data is finalized even later," and this data is used in confirming overage calculations. Defs.' Reply 21.

characteristics suggest that the herring stock may be robust to a single year delay in overage deductions." Id. More importantly, "[t]here is no evidence that a single year delay is more likely to affect the reproductive potential of the stock than an overage deduction in the year immediately following the overage." Id.

Plaintiffs do not offer any evidence that the necessary calculations for the Herring fishery can be completed in time to avoid the delay in overage deduction, nor do they offer "some indication that superior or contrary data was available and that the agency ignored such information." N.C. Fisheries Ass'n, 518 F. Supp. 2d at 85. Instead, Plaintiffs assert that "corrective measures in the fishery are not routinely delayed," Pls.' Mot. 32, and that Defendants "have implemented next-year overage deductions in other fisheries." Pls.' Reply 20. These claims are not enough to show that Defendants' analysis of the needs of this fishery, as outlined above, were unreasonable or based on unreliable information. Bloch, 348 F.3d at 1070; C&W Fish, 931 F.2d at 1562; Ocean Conservancy, 394 F. Supp. 2d at 157.

In sum, Amendment 4 includes two AMs, supplemented by the haddock incidental catch cap, designed to prevent ACL overages and to correct overages when they occur. 50 C.F.R. § 600.310(g). While Plaintiffs have identified what they perceive to be weaknesses with the AMs, they have failed to offer evidence that undermines Defendants' own showing of a reasonable decisionmaking process or

that demonstrates Defendants' rejection of superior information. Particularly in light of the need for deference in this technical and complex area, the Court must defer to Defendants' conclusion that Amendment 4's AMs satisfy the requirements of the MSA. Am. Oceans Campaign, 183 F. Supp. 2d at 14.

**F.   Compliance with NEPA**

Finally, Plaintiffs argue that Defendants' Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") violate NEPA. NEPA's requirements are "procedural," calling upon "agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 193-94 (D.C. Cir. 1991). "NEPA does not mandate particular consequences." Id. at 194.

Under NEPA, agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In an EIS, the agency must "take a 'hard look' at the environmental consequences before taking a major action." Baltimore Gas & Elec. Co., 462 U.S. at 97 (1983) (citations omitted).

However, NEPA provides agencies with a less burdensome alternative--in certain situations, an EA, which is a less thorough report, may suffice. Monsanto Co. v. Geerston Seed Farms, 130 S. Ct. 2743, 2750 (2010) (citing 40 C.F.R. §§ 1508.9(a), 1508.13). An

EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a).[19] After completion of an EA, an agency may conclude that no EIS is necessary. If so, it must issue a FONSI, stating the reasons why the proposed action will not have a significant impact on the environment. Id. § 1501.4(e).

In reviewing an EA or FONSI, courts consider four factors. Courts must determine whether the agency:

> "(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum."

Sierra Club v. Van Antwerp, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (quoting TOMAC v. Norton, 433 F.3d 852, 861 (D.C. Cir. 2006)) (alterations in Van Antwerp).

Courts review EAs and FONSIs under the familiar arbitrary or capricious standard of the APA. Van Antwerp, 661 F.3d at 1154; see

---

[19] Regulations interpreting NEPA's EIS and EA requirements have been promulgated by the Council of Environmental Quality ("CEQ"). See 40 C.F.R. § 1500.1 et seq. Although "the binding effect of CEQ regulations is far from clear," TOMAC v. Norton, 433 F.3d at 861 (D.C. Cir. 2006), both agencies and courts have consistently looked to them for guidance. See, e.g., Sierra Club v. Van Antwerp, 661 F.3d 1147, 1154-55 (D.C. Cir. 2011); Town of Cave Creek, Ariz. v. FAA, 325 F.3d 320, 327-332 (D.C. Cir. 2003); Grand Canyon Trust v. FAA, 290 F.3d 339, 341-42 (D.C. Cir. 2002).

also <u>Pub. Citizen</u>, 541 U.S. at 763 ("An agency's decision not to prepare an EIS can be set aside only upon a showing that it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); <u>Town of Cave Creek, Ariz. v. FAA</u>, 325 F.3d 320, 327 (D.C. Cir. 2003).

Plaintiffs allege a host of deficiencies with Defendants' EA and FONSI. Their claims fall into two categories: (1) Defendants unlawfully segmented their decisionmaking and prejudged the environmental impacts of Amendment 4 to avoid preparing an EIS; and (2) Defendants failed to take a hard look at Amendment 4's environmental consequences.[20] Pls. Mot. 34-44.

### 1.   Segmented Decisionmaking & Prejudgment

Plaintiffs advance two arguments that Defendants' EA was procedurally improper. First, Plaintiffs claim that Defendants unlawfully divided certain actions between Amendments 4 and 5 in order to cast Amendment 4 as insignificant and escape the EIS

---

[20] Because the Court concludes, for the reasons given below, that Defendants' failed to take a "hard look at the problem," <u>Van Antwerp</u>, 661 F.3d at 1154, it will not reach the third set of Plaintiffs' NEPA claims, namely that Defendants erroneously concluded that Amendment 4 will not have a significant environmental impact. Plaintiffs argue that Defendants failed to evaluate the cumulative impacts of Amendment 4, as they must when determining significance, and that Defendants' determination that the action had insignificant effects was in error. Pls.' Mot. 34-38, 41-42. Defendants' main response is that Amendment 4's adoption of an ABC control rule and AMs was procedural only, and did not substantively affect the fishery. Defs.' Mot. 39-40. In any case, Defendants will have to reassess this conclusion after taking a 'hard look' at Amendment 4's impacts.

requirement. Pls.' Mot. 38-39. Plaintiffs are correct that "'[a]gencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without significant impact.'" <u>Jackson Cnty., N.C. v. FERC</u>, 589 F.3d 1284, 1290 (D.C. Cir. 2009) (quoting <u>Coal. on Sensible Transp., Inc. v. Dole</u>, 826 F.2d 60, 68 (D.C. Cir. 1987)); <u>see also</u> 40 C.F.R. § 1508.25(a)(1) ("Connected actions" are actions that are "closely related and therefore should be discussed in the same impact statement."). However,

> "The rule against segmentation . . . is not required to be applied in every situation. To determine the appropriate scope for an EIS, courts have considered such factors as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects."

<u>Jackson Cnty.</u>, 589 F.3d at 1290 (quoting <u>Taxpayers Watchdog, Inc. v. Stanley</u>, 819 F.2d 294, 298 (D.C. Cir. 1987)).

There is no evidence whatsoever in the Administrative Record that Defendants sought to escape their responsibilities under NEPA "by disingenuously describing [the Atlantic herring FMP] as only an amalgamation of unrelated smaller projects." <u>Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n</u>, 677 F.2d 883, 890 (D.C. Cir. 1981). Although the Court has rejected the basis for NMFS's decision not to consider certain issues before the 2011 statutory deadline, <u>supra</u> Part III.B.1., there is no suggestion that NMFS reduced the

scope of Amendment 4 to avoid preparing an EIS. Amendment 4 sets out ACLs and AMs for Atlantic herring. Amendment 5 has been proposed to consider, inter alia, the composition of the fishery and updated monitoring systems. There is no doubt that Amendment 4 has logical termini, has substantial independent utility, does not foreclose future alternatives, and does not irretrievably commit federal funds for closely related projects. Jackson Cnty., 589 F.3d at 1290.

Second, Plaintiffs argue that Defendants "unlawfully pre-determined that only an EA would be necessary for Amendment 4." Pls.' Mot. 40. In this context, "predetermination occurs only when an agency irreversibly and irretrievably commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome." Forest Guardians v. U.S. Fish and Wildlife Serv., 611 F.3d 692, 714 (10th Cir. 2010) (emphasis in original); see also Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd., 663 F.3d 476, 488 (D.C. Cir. 2011) ("'strong' evidence of 'unalterably closed minds' [is] necessary to justify discovery into the Board's decisionmaking process" on the basis of prejudgment); C&W Fish, 931 F.2d at 1565 ("an individual should be disqualified from rulemaking 'only when there has been a clear and convincing showing that the Department member has an unalterably closed mind on matters critical to the disposition of the

proceeding.'") (quoting <u>Ass'n of Nat'l Advertisers, Inc. v. FTC</u>, 627 F.2d 1151, 1170 (D.C. Cir. 1979)).

Plaintiffs have not met the "high standard to prove predetermination." <u>Forest Guardians</u>, 611 F.3d at 714. Plaintiffs' only evidence that Defendants had unalterably closed minds is (1) the statement in the December 17, 2009 memorandum by NMFS's Assistant Regional Administrator for Sustainable Fisheries that "I have determined that, based on our initial review of the proposed subject project and the criteria provided in Sections 5.04 and 6.03 d.2 of NAO 216-6, an environmental assessment is the appropriate level of NEPA review for that project," AR 5639, and (2) the line in the December 28, 2009 Notice of Intent, announcing the narrowed scope of Amendment 4, that "the Council intends to prepare an EA for the action." AR 5641. Neither of these statements rises to the level of irreversibly or irretrievably committing NMFS to a certain course of action. <u>Forest Guardians</u>, 611 F.3d at 714. An administrator's statement of an opinion, based upon review of the action's subject matter and relevant regulatory guidance, suggests conscious thought rather than prejudgment, and does not lead to the conclusion that the administrator would not change his or her mind upon review of the full EA.

In sum, Plaintiffs have failed to demonstrate that Defendants unlawfully avoided the responsibility of preparing an EIS by either

improperly segmenting their actions or predetermining the outcome of the EA.

### 2.   Hard Look

In order to pass muster under NEPA, Defendants' EA and FONSI must have "taken a hard look at the problem." Van Antwerp, 661 F.3d at 1154. Defendants argue that NMFS took a "hard look" at the environmental impact of its action, including the effects on relevant ecosystem components, the Atlantic herring stock, the essential fish habitat, protected species, and non-target/bycatch species, as well as economic and social impacts. Defs.' Mot. 34-35 (citing AR 6032, 6185-201). Plaintiffs do not challenge these arguments. Rather, the thrust of Plaintiffs' argument is that Defendants failed to consider the potential impact of reasonable alternatives. Pls.' Mot. 36, 42-44.

Environmental Assessments must include a "brief discussion . . . of alternatives . . . [and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). In considering the analogous requirement for an EIS, our Court of Appeals explained that "the agency's choice of alternatives are . . . evaluated in light of [its reasonably identified and defined] objectives; an alternative is properly excluded from consideration in an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" City of Alexandria, Va. v.

Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) (quoting Citizens

Against Burlington, 938 F.2d at 195). Although an EA generally

imposes less stringent requirements on an agency than an EIS, it is

clear that an EA's "hard look" must include consideration of

reasonable alternatives. Am. Oceans Campaign, 183 F. Supp. 2d at

19-20; Citizens Exposing Truth About Casinos v. Norton, No. CIV A

02-1754 TPJ, 2004 WL 5238116, at *9 (D.D.C. Apr. 23, 2004); Fund

for Animals v. Norton, 281 F. Supp. 2d 209, 225 (D.D.C. 2003).

Plaintiffs argue that Defendants should have, but failed to

consider the impacts of (1) ACLs and AMs for river herring, (2)

potential alternative ABC control rules, (3) potential improvements

to the current monitoring system, and (4) alternatives for

addressing bycatch. Pls.' Mot. 35-36, 43-44. As to the failure to

consider ACLs or AMs for river herring[21] or alternatives for

---

[21] Defendants have directed the Court's attention to the decision in Oceana, 2011 WL 6357795. Defs.' Notice of Supp. Authority [Dkt. No. 25]. In that case, the court held that NEPA did not require NMFS to consider the composition of the fishery in its EIS. Id. at *28-30. However, in Oceana, the court focused on the challenged amendment's purpose to implement "'a broad range of measures designed to achieve mortality targets, provide opportunities to target healthy stocks, mitigate (to the extent possible) the economic impacts of the measures, and improve administration of the fishery,'" and concluded that the defendants acted within the scope of the amendment's objectives. Id. at *29 (quoting the final amendment) (emphasis in Oceana).

In contrast, in this case, Amendment 4's purpose is "to bring the FMP into compliance with new [MSA] requirements" by setting ACLs and AMs. AR 6325; see also AR 5640 (purpose of Amendment 4 is "to bring the FMP in compliance with [MSA] requirements to specify annual catch limits (ACLs) and accountability measures (AMs)."). For the reasons spelled out above, supra part III.B, Defendants
(continued...)

addressing bycatch, the Court concludes that, for the reasons stated <u>supra</u> Parts III.B-C, Defendants have failed to include a discussion of reasonable alternatives. 40 C.F.R. § 1508.9(b). Defendants have not provided a reasoned explanation for why they could not and did not consider these alternatives, which clearly would "bring about the ends of the federal action," <u>City of Alexandria</u>, 198 F.3d at 867 (internal quotation omitted), which were "to bring the FMP into compliance with new [MSA] requirements" by setting ACLs and AMs. AR 6325.

As to alternatives to the ABC control rule and monitoring, Defendants argue that it was reasonable to delay further consideration until Amendment 5.[22] Defs.' Mot. 40-41. This response is unsatisfactory. A central function of NEPA's requirements is for the agency to consider environmental impacts "[b]efore approving a project." <u>City of Alexandria</u>, 198 F.3d at 866. Therefore, delaying consideration of relevant and reasonable alternatives until a future date violates the "hard look" requirement. 40 C.F.R. § 1508.9(b); <u>Am. Oceans Campaign</u>, 183 F. Supp. 2d at 19-20;

---

[21] (...continued)
could not fulfill the purpose of their proposed Amendment 4 to comply with the strict new MSA requirements without giving some reason for their decision to name only Atlantic herring as a stock in the fishery.

[22] Defendants also claim that it was proper to delay consideration of a permanent ABC control rule until obtaining "a proper scientific basis." Defs.' Mot. 41. This argument misses the point. Even if setting an "interim" ABC control rule, Defendants could have considered alternative interim ABC control rules. <u>See</u> Pls.' Mot. 43.

see also Found. on Econ. Trends v. Heckler, 756 F.2d 143, 158 (D.C. Cir. 1985) ("agency determinations about EIS requirements are supposed to be forward-looking"); Nat'l Wildlife Fed'n, 677 F.2d at 889 ("'the basic function of an EIS is to serve as a forward-looking instrument to assist in evaluating proposals for major federal action'") (quoting Aersten v. Landrieu, 637 F.2d 12, 19 (1st Cir. 1980)).

More importantly, Defendants' EA demonstrates a total failure to consider the environmental impacts of alternatives to the proposed ABC control rule or AMs. The EA does contain a section entitled "Environmental Impacts of Management Alternatives," but this section only compares the effects of the proposed ACL and AM rules to "no action" alternatives. AR 6037, 6185-95. As the EA itself admits, the "no action" alternative is in fact no alternative at all--taking no action would result in a plain violation of the MSA's ACL and AM requirements.[23] 16 U.S.C. § 1853(a)(15); AR 6185. Obviously, actions that would violate the MSA cannot be reasonable alternatives to consider. Am. Oceans Campaign,

---

[23] This is another reason that Oceana is not applicable to this case. In Oceana, the so-called "'no-action' alternative" actually entailed using the MSY Control Rule as the ABC control, thereby fulfilling the MSA's mandate to set in place a process for establishing ACLs. 2011 WL 6357795, at *31-35. By contrast, in this case, in Defendants' own words, "[u]nder the no action alternative no process for setting ACLs would be established" and therefore "the alternative fails to comply with the MSA or NS1 Guidelines." AR 6185. Hence, in Oceana, the no action alternative was legally permissible, whereas for Amendment 4 the no action alternative is not a legally viable option.

183 F. Supp. 2d at 20 (finding failure to consider reasonable alternatives where EAs did "not even consider any alternatives besides the status quo (which would violate the FCMA).").

Equally conspicuous is the fact that while Amendment 4 does contain analysis of rejected alternatives in its substantive sections, there is no related consideration of environmental impacts in its Environmental Assessment. For example, the Council considered alternate ABC control rules, such as use of a one-year or five-year average for defining recent catch, and AMs, such as closure of management areas at a lower percentage of ACL, establishment of a threshold/trigger for an in-season adjustment to ACL, and establishment of a lower trigger for closing the fishery in the following year, to name a few. AR 6083-84, 6088. Tellingly, none of these alternatives receive any treatment in the Environmental Assessment.

In the absence of consideration of alternatives, the Court cannot say that Defendants took a "hard look" at Amendment 4's environmental impacts. 40 C.F.R. § 1508.9(b); Van Antwerp, 661 F.3d at 1154; Am. Oceans Campaign, 183 F. Supp. 2d at 20. Therefore, Defendants' reliance on Amendment 4's EA and resulting FONSI was arbitrary and capricious. Van Antwerp, 661 F.3d at 1154; Pub. Citizen, 541 U.S. at 763.

### G.    Remedy

The question of the appropriate remedy in this case presents substantial complexities. Plaintiffs argue that the Court "has the power to design a remedy that both establishes a deadline and directs the Defendants to take specific actions to comply with the law" and that the Court ought to vacate Amendment 4. Pls.' Supp. Mem. 4-5. Defendants argue that Plaintiffs' requests "conflict[] with the law of this Circuit" and urge the Court to remand to the agency for further consideration. Defs.' Mot. 42. The question of remedy is further complicated by the fact that many of Amendment 4's deficiencies may be remedied by Amendment 5, which is already under consideration, with a targeted implementation date of January 1, 2013. Defs.' Mot., Ex. 2. At oral argument, the parties requested an opportunity to further brief the remedy issue, should Plaintiffs' prevail in any of their claims. Therefore, the Court will withhold judgment on the question of remedy. The accompanying Order contains a briefing schedule to resolve this issue.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is **granted in part and denied in part** and Defendants' Motion for Summary Judgment is **granted in part and denied in part.**

An Order will issue with this opinion.


                                    /s/
March 8, 2012                       Gladys Kessler
                                    United States District Judge


**Copies to:** counsel of record via ECF