UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL S. FLAHERTY, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 11-0660 (GK) |
| | : | |
| PENNY PRITZKER, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OPINION

Plaintiffs Michael S. Flaherty, Captain Alan A. Hastbacka, and the Ocean River Institute bring this suit against Defendants Commerce Secretary Penny Pritzker, the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS") (collectively, "Defendants"), as well as Defendant-Intervenor Sustainable Fisheries Coalition ("SFC"). Plaintiffs allege that the final rule implementing Framework Adjustment 2 to the Atlantic Herring Fishery Management Plan and the Atlantic Herring Fishery Specifications for the 2013-2015 Fishing Years ("2013-2015 Specifications") violates the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 et seq.

This matter is now before the Court on Cross-Motions for Summary Judgment [Dkt. Nos. 88, 96, & 99]. Upon consideration of the Motions, Oppositions, Replies, the entire record herein, and for the reasons stated below, Plaintiffs' Motion for Summary Judgment is **denied**, Defendant-Intervenor's Motion for Summary Judgment is **denied**, and Defendants' Motion for Summary Judgment is **granted**.

I.   BACKGROUND

    a.   Statutory Background

        i.   The Magnuson-Stevens Act[1]

The MSA is designed to conserve and manage fishery resources in U.S. waters and coastal areas. It establishes eight Regional Fishery Management Councils, which are responsible for developing fishery management plans ("FMPs"). 16 U.S.C. §§ 1852. FMPs are required to include the "conservation and management measures" that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." Id. § 1853(a)(1)(A). FMPs must also be consistent with the ten National Standards provided for in the MSA, as well as all other provisions of the

---

[1] A more thorough description of the MSA can be found in this Court's prior Memorandum Opinion. Flaherty v. Bryson, 850 F. Supp. 2d 38 (D.D.C. 2012).

MSA, and "any other applicable law." Id. § 1853(a)(1)(C); see also id. § 1851 (setting forth National Standards). The Secretary of Commerce, acting through NMFS, is required by the MSA to establish "advisory guidelines" for implementing the National Standards. 16 U.S.C. § 1851(b); see also 50 C.F.R. 600.305 et seq. (National Standards guidelines).

Once a council has developed a plan, NMFS must review the plan to determine whether it comports with the ten National Standards and other applicable law. Id. § 1854(a)(1)(A). Next, after a period of notice and comment, NMFS must "approve, disapprove, or partially approve a plan or amendment," depending on whether the plan or amendment is consistent with the National Standards and applicable law. Id. § 1854(a)(3). If NMFS approves the plan or does not express disapproval within 30 days, the FMP becomes effective. Id. § 1854(a)(3).

At the beginning of 2007, Congress re-authorized and amended the MSA. Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 ("MSRA"), P.L. 109-479, 120 Stat. 3575 (2007). The amended MSA significantly enlarged the duties of the council and NMFS by requiring FMPs to contain mechanisms for setting the limits, termed Annual Catch Limits ("ACLs"), on the amount of fish caught and accountability measures ("AMs") for ensuring compliance with the ACLs. 16 U.S.C. § 1853(a)(15). In response to the new requirements, NMFS revised its guidelines for

−3−

National Standard 1 to provide guidance for interpreting the concepts adopted in the amendment. 74 Fed. Reg. 3178 (January 16, 2009).

The setting of an ACL involves a multi-step process intended to generate a scientific basis for the final catch limit. The following is an extremely abbreviated overview of what is a very complicated process. 50 C.F.R. § 600.310(f). First, a council must define an overfishing limit ("OFL"), which is, at its most basic, an estimate of the rate of fishing at which a fishery will not be sustainable. Id. § 600.310(e)(1)(i)(A)-(2)(i)(E).

Second, the council must determine the acceptable biological catch ("ABC"), which is the amount of fish that may be caught without exceeding the OFL, after taking into account scientific uncertainty. Id. § 600.310(f)(2)(ii). In order to set the ABC, the council must first establish an "ABC control rule," which explains how the council will account for scientific uncertainty when setting the ABC. 50 C.F.R. § 600.310(f)(4). The council must create its ABC control rule based on scientific advice from its Scientific and Statistical Committee ("SSC"). 50 C.F.R. § 600.310(f)(4). The objective of the ABC control rule is to create a buffer between OFL and ABC so that there is a low risk that OFL will be exceeded. See id. §§ 600.310(b)(3), (f)(4).

Third, and finally, the council must set the ACL, which is the amount of fish that may be caught without exceeding the ABC,

-4-

after taking into account management uncertainty, such as late reporting, misreporting, and underreporting of catch. Id. § 600.310(f)(1).

To summarize, in the process of setting the final ACL, the council must solicit scientific advice from its SSC and, based on that advice, establish an acceptable biological catch rule. The ABC control rule is relied on to set the ABC, which must be equal to or less than OFL, to account for scientific uncertainty, and the final ACL must be equal to or less than ABC, to take into account management uncertainty. Id. § 600.310(e)-(f). Finally, ACLs must also be consistent with the National Standards. Id. § 1853(a)(1)(C).

### ii.  The National Environmental Policy Act

Congress enacted NEPA in order "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b).

To accomplish that goal, NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") whenever they propose "major Federal actions significantly affecting the quality of the human environment." Id. § 4332(C). In an EIS, the agency must "take a 'hard look' at the environmental consequences before

-5-

taking a major action." Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983) (citation omitted). "NEPA exists to ensure a process, not to ensure any result." Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996) (emphasis in original) (citation ommitted).

To determine whether an EIS must be prepared, the agency must first prepare an environmental assessment ("EA"). 40 C.F.R. § 1501.4(b). An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." Id. § 1508.9(a)(1). If the agency determines, after preparing an EA, that a full EIS is not necessary, it must prepare a Finding of No Significant Impact ("FONSI") setting forth the reasons why the action will not have a significant impact on the environment. Id. §§ 1501.4(e), 1508.13. Even if the agency performs only an EA, it must still briefly discuss the need for the proposal, the alternatives, and the environmental impacts of the proposed action and alternatives. Id. § 1508.9(b).

   b.   Factual Background

The U.S. Atlantic herring fishery is managed through the Atlantic Herring Fishery Management Plan ("Herring FMP"). The Herring FMP was developed by the New England Fishery Management Council (the "Council") and became effective on January 10, 2001.

See <u>Flaherty v. Bryson</u>, 850 F. Supp. 2d 38, 45 (D.D.C. 2012) ("Flaherty I").

Atlantic herring inhabit the Atlantic Ocean off the east coast of the United States and Canada, ranging from North Carolina to the Canadian Maritime Provinces. <u>Id.</u> Atlantic herring play a vital role in the Northwest Atlantic ecosystem, serving as a "forage species," i.e. food, for a number of other fish, marine mammals, and seabirds. <u>Id.</u> Atlantic herring also play an important role in the region's economy because of the prevalence of commercial fishing. <u>Id.</u>

### i.   Amendment 4

On March 2, 2011, NMFS published its Final Rule implementing "Amendment 4" to the Herring FMP. <u>Final Rule</u>, 76 Fed. Reg. 11,373 (Mar. 2, 2011). The Council and NMFS had developed Amendment 4 to bring the FMP into compliance with new ACL and accountability measure requirements of the MSA by the 2011 statutory deadline. <u>See</u> Final Rule, 76 Fed. Reg. 11,372 (Mar. 2, 2013). Plaintiffs brought this suit to challenge several aspects of Amendment 4. <u>See</u> Complaint [Dkt. No. 1]. On March 8, 2012, this Court issued its opinion on the parties' cross-motions for summary judgment which, <u>inter alia</u>, upheld the ACLs and AMs of Amendment 4, but found that the agency had failed to consider the potential environmental impacts of reasonable alternatives, as required by NEPA. <u>See</u> <u>Flaherty I</u>, 850 F. Supp. 2d 38.

—7—

### ii. Framework Adjustment 2 and Atlantic Herring Fishery Specifications for 2013-2015

On October 4, 2013, NMFS issued a final rule implementing the 2013-2015 Specifications. 78 Fed. Reg. 61828 (Oct. 4, 2013); <u>see also</u> accompanying Final Environmental Assessment, AR 010991-011393. The 2013-2015 Specifications set catch specifications for the herring fishery for the 2013-2015 fishing years, including new ACLs and additional AMs. The 2013-2015 Specifications were based on the most recent stock assessment ("SAW 54") for Atlantic herring, prepared by the 2012 Stock Assessment Review Committee of the 54th Northeast Regional Stock Assessment Workshop. 78 Fed. Reg. at 61829.

The Council considered, in varying degrees of detail, five potential ABC control rules for selection. The first, referred to as the "no action" alternative, would have maintained the ABC specifications from 2012. AR 011034. The second, referred to as the "constant catch" alternative, would specify a constant ABC of 114,000 metric tons for all three years. AR 011035. The third, referred to as the "75% $F_{MSY}$"[2] alternative, would have set the ABC

---

[2] $F_{MSY}$ is "the fishing mortality rate that, if applied over the long term would result in [Maximum Sustainable Yield]." Maximum Sustainable Yield (MSY) is defined as the "largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics . . . and the distribution of catch among fleets." 50 C.F.R. § 600.310(e)(1)(i).

at 130,000 metric tons in 2013, 102,000 metric tons in 2014, and 88,000 metric tons in 2015. AR 011038.

Plaintiffs submitted two additional ABC control rules for consideration, referred to as the Lenfest Control Rule and the Pacific Control Rule. Both the Lenfest and Pacific Control Rules use a rate of 50% of $F_{MSY}$ and under both those Rules the ABC would have been 93,000 metric tons in 2013, 77,000 metric tons in 2014, and 68,000 metric tons in 2015. AR 011066. The difference between the two is that under the Lenfest Control rule, the fishing rate would decrease as herring biomass decreased, and if the herring biomass decreased below a cutoff level, all fishing would cease. AR 011065-66. Under the Pacific Control Rule, the fishing rate would stay the same until herring biomass declined below the cutoff level, at which time all fishing would cease. AR 011066.

### c.   Procedural Background

Plaintiffs filed their Complaint [Dkt. No. 1] on April 1, 2011, challenging Amendment 4. On March 8, 2012, this Court issued a Summary Judgment Order holding that Amendment 4 violated certain provisions of the MSA, APA, and NEPA. See Flaherty I, 859 F. Supp. 2d at 73.

On August 2, 2012, after further briefing on the proper remedy, this Court issued a detailed Memorandum Order remanding the action to Defendants and containing specific guidance, as well as a timeline, for actions Defendants were to take and complete

within one year ("Remedial Order") [Dkt. No. 41]. What is relevant
to the Motions at hand is that the Remedial Order instructed
Defendants to recommend to the Council that it consider, "as part
of the 2013-2015 herring specifications (or another appropriate
action to be completed within one year of the date of [the remedial
order])," a range of alternatives "to the interim ABC control rule
for the Atlantic herring fishery, at least one of which shall be
based on the most recent best available science for setting ABC
control rules for herring and other forage fish." Id. at 12-13.

On November 4, 2013, Plaintiffs filed a motion for leave to
file a Supplemental Complaint to challenge NMFS's final rule
implementing the 2013-2015 Specifications [Dkt. No. 59], which was
granted on December 27, 2013 [Dkt. No. 66]. On November 22, 2013,
Plaintiffs filed a separate Motion to Enforce the Remedial Order
[Dkt. No. 62]. Plaintiffs alleged that Defendants failed to comply
with the Court's Remedial Order in several ways. One of Plaintiffs'
allegations was that Defendants failed to consider a reasonable
range of alternatives to the interim Atlantic Herring ABC control
rule, including at least one based on the best available science,
in the NEPA analysis for the 2013-2015 Specifications. Id. at
17-28.

This Court denied Plaintiffs' Motion to Enforce on February
19, 2014, finding that Defendants had complied with each of the
requirements set forth in the Remedial Order and that Plaintiffs

had "obtained all of the relief to which they are entitled." Memorandum Opinion at 12 [Dkt. No. 87]. This Court did note however, that the ruling did not exclude the Defendants' recent actions from review and Plaintiffs were still able to seek review "on a ground other than the agency's failure to consider reasonable alternatives." Id. at 12 (quoting Heartland Reg'l Med. Ctr. v. Leavitt, 415 F.3d 24, 28 (D.C. Cir. 2005)).

On January 22, 2014, Sustainable Fisheries Coalition, a coalition of vessel owners and processing companies that participate in the Atlantic sea herring fishery, filed a Motion to Intervene [Dkt. No. 76]. The Motion to Intervene was granted on February 12, 2014 [Dkt. No. 85].

On March 7, 2014, Plaintiffs filed their Motion for Summary Judgment ("Pls.' Mot.") [Dkt. No. 88]. Defendants filed their Opposition to Plaintiffs' Motion and their Cross-Motion for Summary Judgment ("Defs.' Mot.") [Dkt. No. 96] on April 7, 2014, and Intervenor Defendants filed their Opposition to Plaintiffs' Motion and Cross-Motion for Summary Judgment ("SFC Mot.") [Dkt. Nos. 99 & 100] on April 9, 2014. On May 7, 2014, Plaintiffs filed their Reply to Defendants' Opposition and Opposition to Defendants' Motion ("Pls.' Reply") [Dkt. No. 103]. On May 23, 2014, Defendants filed their Reply to Plaintiffs' Opposition ("Defs.' Reply") [Dkt. No. 105] and Intervenor Defendants filed their Reply to Plaintiffs' Opposition ("SFC Reply") [Dkt. No. 106].

-11-

## II.  STANDARD OF REVIEW

### a.  Summary Judgment

Summary judgment will be granted when there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(a). Because this case involves a challenge to a final administrative decision, the Court's review on summary judgment is limited to the administrative record. Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record").

The purpose of a motion for summary judgment challenging final agency action is "to test the agency action against the administrative record." Comment to U.S. Dist. Ct. Rules D.C., Rule 7(h). The Court must evaluate the agency's decision on the basis of "the full administrative record that was before the Secretary at the time [she] made [her] decision." Citizens to Pres. Overton Park v. Volpe, 401 U.S. 402, 420 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 (1977). In reviewing agency action, the district court "sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether

–12–

the Secretary's [action] was factually flawed." Marshall Cnty.
Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C. Cir. 1993).

   **b.   Administrative Procedure Act**

   Agency decisions under the Magnuson-Stevens Act and NEPA are
reviewed  pursuant  to  Section  706(2)  of  the  APA.  16  U.S.C.
§ 1855(f)(1)(B)  ("the  appropriate  court  shall  only  set  aside"
actions  under  the  MSA  "on  a  ground  specified  in  [5 U.S.C. §§]
706(2)(A),  (B),  (C),  or  (D).");  Oceana,  Inc.  v.  Locke,  670  F.3d
1238,  1240-41  (D.C.  Cir.  2011);  C & W  Fish  Co.  v.  Fox,  931  F.2d
1556,  1562  (D.C.  1991);  Oceana  Inc.,  v.  Locke,  831  F.  Supp.  2d  95,
106  (D.D.C.  2011).  Section  706(2)  of  the  APA  requires  a  court  to
hold  agency  action  unlawful  if  it  is  "arbitrary,  capricious,  an
abuse  of  discretion,  or  otherwise  not  in  accordance  with  law."  5
U.S.C. § 706(2).

   The  arbitrary  and  capricious  standard  of  the  APA  is  a  narrow
standard  of  review.  Citizens  to  Preserve  Overton  Park,  Inc.  v.
Volpe,  401  U.S.  402,  416  (1971).  It  is  well  established  in  our
Circuit  that  the  "court's  review  is  .  .  .  highly  deferential"  and
"we  are  'not  to  substitute  [our]  judgment  for  that  of  the  agency'
but  must  'consider  whether  the  decision  was  based  on  a
consideration  of  the  relevant  factors  and  whether  there  has  been
a  clear  error  of  judgment.'"  Bloch  v.  Powell,  348  F.3d  1060,  1070
(D.C.  Cir.  2003)  (quoting  S.  Co.  Servs.,  Inc.  v.  FCC,  313  F.3d
574,  579-80  (D.C.  Cir.  2002));  see  also  United  States  v.  Paddack,

825 F.2d 504, 514 (D.C. Cir. 1987). However, this deferential standard can neither permit courts "merely to rubber stamp agency actions," NRDC v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000), nor be used to shield the agency's decision from undergoing a "thorough, probing, in-depth review." Midtec Paper Corp. v. United States, 857 F.2d 1487, 1498 (D.C. Cir. 1988) (internal citations and quotations omitted).

An agency satisfies the arbitrary and capricious standard if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); Lichoulas v. FERC, 606 F.3d 769, 775 (D.C. Cir. 2010). However, courts "do not defer to the agency's conclusory or unsupported suppositions." McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1186-87 (D.C. Cir. 2004).

## III. ANALYSIS

### a. Jurisdiction

#### i. Standing

While both Plaintiffs and Defendants agree that the Court has jurisdiction to hear this case, Defendant-Intervenor SFC argues that Plaintiffs lack standing to challenge the ABC control rule. The doctrine of standing reflects Article III's "fundamental

limitation" of federal jurisdiction to actual cases and controversies. Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). The doctrine "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of federal-court jurisdiction.'" Id. (emphasis on "his" in original) (quoting Warth v. Seldin, 422 U.S. 490, 498-99 (1975)).

To obtain the relief they seek, Plaintiffs must show that (1) they have "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000); see also Summers, 555 U.S. at 493; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992); Shays v. FEC, 414 F.3d 76, 83 (D.C. Cir. 2005). SFC contends that Plaintiffs have not shown how they were injured by the ABC control rule (as distinguished from the ACLs) or how a favorable decision by this Court could redress those injuries. SFC Mot. at 23.

In its 2012 decision, this Court found that Plaintiffs had standing to challenge Amendment 4. Flaherty I, 850 F. Supp. 2d at 50. SFC concedes that Plaintiffs have standing to challenge

ACLs and AMs. SFC Mot. at 23. The crux of SFC's standing challenge is that the ACLs and AMs are the source of any alleged injuries, not the ABC control rule, and therefore, because Plaintiffs have not been harmed by the ABC control rule, they do not have standing to challenge it. Id. at 23-24.

The Court finds the distinction between the ACLs and the ABC control rule to be irrelevant for standing purposes. The ABC control rule is part of the "mechanism for specifying annual catch limits," 16 U.S.C. § 1853(a)(15), and directly informs the setting of the ACL, 50 C.F.R. § 600.310(f) (Guidelines to National Standard 1).[3] The causal relationship between the ABC control rule, the ABC, and the ACL is so direct and clear that any alleged harms of the ABC control rule are, as a practical matter, practically indistinguishable from any possible harms of the ACL. The causal chain between the ABC control rule and the ACL is not, as SFC contends, "far too attenuated to constitute particularized injury." SFC Mot. at 24 (internal quotations marks and citation omitted). The harms Plaintiffs have alleged are directly traceable to the ABC control rule via the ACL. This is more than sufficient to satisfy the causation prong of standing.

---

[3] While the National Standard Guidelines do not have the force of law, they exist to assist in the development of FMPs. 16 U.S.C. § 1851(b)

SFC offers no explanation why Plaintiffs' proposed remedies are insufficient to redress their injuries. Id. at 25. It is not enough to simply say that Plaintiffs have not shown "how a favorable decision by this court could relieve those injuries," SFC Reply at 5, and, in the absence of further explanation, this argument fails. Plaintiffs' requests for relief, see Supp. Complaint at 31-32 [Dkt. No. 67], would remedy their injuries and are also within the Court's power.

For the foregoing reasons, the Court finds that Plaintiffs have standing to bring their claim.

### ii.   Subject Matter Jurisdiction

SFC also argues that the Court does not have subject matter jurisdiction over the ABC control rule, relying on the same distinction between ACLs and ABCs made in its standing argument. The MSA provides courts with the authority to review any "regulation promulgated by the Secretary" and "actions that are taken by the Secretary under regulations which implement a fishery management plan." 16 U.S.C. § 1855(f)(2). SFC concedes that the Court has subject matter jurisdiction over ACLs and that this Court previously reviewed the ABC control rule in Flaherty I. SFC Mot. at 25.

SFC argues that the ABC control rule "used in the specification setting process" was "developed and employed by the Council," but was not approved by NMFS in the 2013-2015

-17-

Specifications. Put differently, SFC argues that the ABC control rule was only a tool used to develop the ACLs, but was not adopted in the 2013-2015 Specifications; only the ACLs were. SFC contends that the ABC control rule is therefore "neither a 'regulation' nor 'action' over which the MSA grants jurisdiction." SFC Mot. at 25.

SFC attempts to distinguish the instant ABC control rule from the one reviewed by the Court in Flaherty I on the grounds that, in Flaherty I, the "control rule itself was likely under this Court's jurisdiction as part of Amendment 4." Id. SFC does not explain why the same logic does not apply to the ABC control rule currently at issue. SFC states that the "ACLs are developed by the Council under the Herring FMP and recommended to the Secretary as 'proposed regulations . . . for the purposes of implementing that FMP," and therefore they "clearly fall within the MSA's judicial review provisions." Id. (citing 16 U.S.C. § 1853(c)). Once again, SFC tries to differentiate the ACL from the ABC control rule by stating that the ABC control rule "was not reviewed or approved by NMFS in the Specifications." Id.

This distinction has no merit. The Council develops both the ABC control rule and the ACLs, and recommends the specifications to the Secretary. The relevant herring regulation, provides that "NMFS shall make a final determination concerning the specifications for Atlantic herring. Notification of the final specifications and responses to public comments shall be published

-18-

in the Federal Register." 50 C.F.R. § 648.200(d). NMFS implemented

the 2013-2015 Specifications, including the ACLs and ABC control

rule, in its Final Rule. 78 Fed. Reg. at 61836 ("Relative to the

status quo, <u>the specifications for setting the herring constant</u>

<u>catch ABC and OFL for 2013-2015 implemented by this rule</u> will

result in an increase in OFL and ABC. Increasing, then maintaining

a stable OFL and ABC would provide net benefits to the herring

industry in the short and long term, relative to the status quo.")

(emphasis added).

Therefore, the ABC control rule, which was included in the

2013-2015 Specifications implemented by NMFS, is an action "taken

by the Secretary under regulations which implement a fishery

management plan," and is subject to judicial review by this Court

per the MSA. 16 U.S.C. § 1855(f)(2). As in <u>Flaherty I</u>, this court

has subject matter jurisdiction over the ABC control rule.

> **b.   The ACLs and ABC Control Rule Comply with National**
>       **Standards 1 and 2**

Plaintiffs allege that the 2013-2015 Specifications do not

meet the MSA's mandate to establish an ABC control rule and ACLs

that prevent overfishing based on the best available science, and

therefore they violate National Standards 1 and 2, as well as the

APA. Pls.' Mot. at 21, 31.

1. Plaintiffs argue that the ACLs in the 2013-2015

Specifications violate National Standard 1 because they are

derived from an ABC control rule that will not prevent overfishing. Pls.' Mot. at 21, 33-35. National Standard 1 states that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1). The guidelines for National Standard 1 also recommend that fishing mortality declines as stock size declines. 50 C.F.R. § 600.310(f)(4). Under the 2013-2015 Specifications, the fishing mortality rate will increase by 36 percent as the estimated biomass decreases by 36 percent over three years - which Plaintiffs allege is contrary to the guideline recommendations. Pls.' Mot. at 31. In addition, in 2015, the final year of the Specifications, the overfishing limit and the ABC will be the same, leaving no buffer for scientific uncertainty. Id.

While the fact that OFL will equal ABC in 2015 does provide some cause for concern, it is also clearly permissible. See 50 C.F.R. § 600.310(f)(3) ("While the ABC is allowed to equal OFL, NMFS expects that in most cases ABC will be reduced from OFL to reduce the probability that overfishing might occur in a year."). By contrast, where the OFL, ABC, and ACL are all the same (which is not the case here), the regulation explicitly states that the measures would provide for no uncertainty and would presumably "not prevent overfishing." 50 C.F.R. § 600.310(f)(5)(i).

Defendants point out that, at this time, the Atlantic herring stock is neither overfished nor subject to overfishing, and argue

that the 2013-2015 Specifications will continue to prevent overfishing. Defs.' Mot. at 15 (citing AR 011637). Plaintiffs have neither shown nor alleged that the stock is overfished or subject to overfishing, nor do they provide any information calling into question the SSC's determination that overfishing is unlikely under the constant catch control rule. See AR 011642 ("The SSC concluded that the proposed specifications are unlikely to result in overfishing in the next 3 years."); Pls.' Mot. at 22-24. Plaintiffs argue that omitting a buffer between OFL and ABC to account for scientific uncertainty "does not meet the National Standard 1 mandate to prevent overfishing" and conflicts with the guidelines' assumption that ABC will be reduced from OFL in "most cases." Pls.' Mot. at 34. But, as discussed previously, the lack of a buffer between the OFL and ABC is not per se evidence that National Standard 1 has been violated, as the guidelines expressly permit this practice, even if they do not recommend it. See 50 C.F.R. § 600.310(f)(3).

It is not enough that Plaintiffs would have preferred an ACL or ABC control rule that preserved a greater stock of Atlantic herring. Plaintiffs have not provided any evidence to suggest that the ACL will permit overfishing, other than arguing that the ACL would have been lower had forage considerations been sufficiently accounted for. Pls.' Mot. at 32-33. The question before the Court is whether the 2013-2015 Specifications violate National Standard

1 by not preventing overfishing, and Plaintiffs have failed to
show that the 2013-2015 Specifications will not prevent
overfishing.

2. Next, Plaintiffs argue that Defendants violated National
Standard 2 because they did not rely on the best available science
for forage fish and disregarded relevant factors when setting the
ACLs and ABC control rule. Pls.' Mot at 21, 34-35. National
Standard 2 instructs that "[c]onservation and management measures
shall be based upon the best scientific information available."
16 U.S.C. § 1851(a)(2). National Standard 2 "requires that rules
issued by the NMFS be based on a thorough review of all the relevant
information available at the time the decision was made . . . and
insures that the NMFS does not 'disregard superior data' in
reaching its conclusions." Ocean Conservancy v. Guitierrez, 394 F.
Supp. 2d 147, 157 (D.D.C. 2005) (quoting Bldg. Indus. Ass'n v.
Norton, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001)).

This rule "is a practical standard requiring only that fishery
regulations be diligently researched and based on sound science."
Ocean Conservancy, 394 F.Supp.2d at 157. Further, "[c]ourts give
a high degree of deference to agency actions based on an evaluation
of complex scientific data within the agency's technical
expertise." Am. Oceans Campaign v. Daley, 183 F.Supp.2d 1, 4
(D.D.C. 2000) (citing Baltimore Gas & Elec. Co., 462 U.S. at 103).
Therefore, "[l]egal challenges to the Secretary's compliance with

-22-

National Standard 2 are frequent and frequently unsuccessful."
N.C. Fisheries Ass'n, 518 F. Supp. 2d at 85. Plaintiffs face a
"high hurdle" in trying to overturn agency decisions on this basis.
Id.

The parties agree that the 2013-2015 Specifications were
based on the SAW 54 stock assessment, that the SAW 54 assessment
incorporated forage considerations, and that the SAW 54
"represents [the] best available science for the purpose of
estimating the current population of Atlantic Herring and
biological reference points." Pls.' Mot. at 26-27; see also Defs.'
Mot. at 22. According to Plaintiffs, even though Defendants were
correct to rely on SAW 54, they "failed to take the critical second
step in setting catch levels that prevent overfishing. That is,
they failed to establish and apply an appropriate ABC control rule
based on the best available science . . . ." Pls.' Mot. at 27
(emphasis in original). The second step Plaintiffs refer to relates
not to the quality of the information available, but to the
substantive decision Defendants made based upon that information.

However, as noted earlier, our Court of Appeals has cautioned
that "we are 'not to substitute [our] judgment for that of the
agency' but must consider whether the decision was based on a
consideration of the relevant factors and whether there has been
a clear error of judgment." Bloch, 348 F.3d at 1070. In this
instance, the Court concludes that Defendants definitely

considered the relevant factors and made no clear error of judgment.

3.   Plaintiffs take issue with the fact that the constant catch ABC control rule (the rule ultimately selected) was not one of the catch projections analyzed in the SAW 54 and was not peer reviewed. Plaintiffs contend that there is therefore "little basis to conclude this ABC control rule represents the best available science." Pls.' Mot. at 31 (citing AR 002162, 000207). Defendants counter that the stock assessment itself was peer-reviewed and that the MSA does not require peer review of ABC control rules. Defs.' Mot. at 23 (citing 50 C.F.R. § 600.310(f)(4) ("[t]he process of establishing an ABC control rule could also involve science advisors or the peer review process established under [MSA] § 302(g)(1)(E)" (emphasis added)).

This case is easily distinguished from NRDC v. Evans, cited by Plaintiffs, where the court criticized NMFS for failing to account for new scientific data and instead relying on "static estimates that are 15 years old." 168 F. Supp. 2d 1149, 1154 (N.D. Cal. 2001) (rev'd in part on other grounds, 316 F.3d 904 (9th Cir. 2003)). In this case, Plaintiffs are not arguing that the data relied on was outdated, but rather that Defendants "ignored new scientific methodologies for managing forage fish identified by Plaintiffs and placed in the administrative record, and failed to make reasoned determinations." Pls.' Mot. at 34.

4. The aforementioned methodologies identified by Plaintiffs are the two ABC control rules they put forward - the Lenfest Control Rule and the Pacific Control Rule - which are "based on the most recent scientific studies of forage fish." Pls.' Mot. at 16 (citing several studies). Plaintiffs fail to explain why these particular studies are clearly the "best available science" or why the SAW 54 is not sufficiently sound science. Pls.' Mot. at 16-18, 28-29. In any event, the Administrative Record indicates that several of the studies cited by Plaintiffs were among the materials evaluated. See AR 004909-4946. The Lenfest and Pacific Control rules were also considered, but were rejected by NMFS. See AR 011065 (EA, section 2.2.7, Alternatives Considered but Rejected); see also infra, Section III.C.

Once again, Plaintiffs' criticism appears not to be targeted at the data relied on in preparing the 2013-2015 Specifications, but rather the outcome chosen by Defendants. The best available science, in Plaintiffs' view, "demonstrates that an approach that reduces fishing rates and maintains higher stock sizes is more appropriate for forage fish." Pls.' Mot. at 26. Again, Plaintiffs are basing their evaluation of what the "best available science" is to achieve an outcome that reduces fishing for forage species. To the extent Plaintiffs argue that forage considerations must be included to constitute the best available science, Plaintiffs themselves state that "[i]t is undisputed that the 2012 herring

-25-

stock assessment [SAW 54] incorporates forage considerations into the model to better account for consumption of herring by predators, and therefore represents the best available science for the purpose of estimating the current population of Atlantic herring and biological reference points." Pls.' Mot. at 26-27.

All told, Plaintiffs' argument is that, because the selected ABC control rule does not "reduce fishing rates and maintain higher biomass based on changing biomass projections and scientific uncertainty," "Defendants failed to take the critical second step in setting catch levels that prevent overfishing," and therefore "they failed to establish and apply an appropriate ABC control rule based on the best available science for managing forage fish." Pls.' Mot. at 27. Plaintiffs are not disputing the science relied on, but believe that the "best available science" would mandate the selection of an ABC control rule with a lower depletion rate, and therefore the selected ABC control rule cannot be based on the best available science. This logic is flawed.

As discussed, National Standard 2 requires diligent research and sound science. See supra, 22. It does not mandate outcomes. National Standard 2 is in place to ensure "that rules issued by the NMFS be based on a thorough review of all the relevant information available at the time the decision was made and [] that the NMFS does not disregard superior data in reaching its conclusions." Ocean Conservancy, 394 F. Supp. 2d at 157 (internal

quotation marks and citations omitted). The Council considered the advice of its SSC, examined several options for setting the ABC control rule, including the Lenfest and Pacific Control Rules, and made a reasoned determination that using the constant catch rule offered the best approach.

To sum up, Plaintiffs have failed to substantiate their allegations that the ACLs and ABC control rule in the 2013-2015 Specifications do not rely on the best available science and will not prevent overfishing. As this Court stated in its prior opinion in this matter, "[a]lthough Plaintiffs may be correct that the Council could have selected a more conservative ABC control rule, which would have resulted in a more conservative ACL, Plaintiffs must do far more than simply show that Defendants did not take their preferred course of action." Flaherty I, 850 F. Supp. 2d at 63. The Court must defer to an agency's rational decision when supported by the Administrative Record, as is the case here, and particularly when that decision involves the type of technical expertise relied upon in this case. Bloch, 348 F.3d at 1070; C & W Fish Co., 931 F.2d at 1562; Am. Oceans Campaign, 183 F. Supp. 2d at 4. Therefore, the Court concludes that Defendants' adoption of the constant catch control rule and the resultant ACLs in the 2013-2015 Specifications were not in violation of the MSA.

c.  **Defendants Considered a Reasonable Range of ABC Control Rule Alternatives**

Similar to their Amendment 4 challenge in <u>Flaherty I</u>, Plaintiffs argue that Defendants failed to consider a reasonable range of ABC control rule alternatives in their associated environmental impact statement, as required by NEPA. <u>See</u> Pls.' Mot. at 35; <u>Flaherty I</u>, 850 F. Supp. 2d at 71-72.

As discussed previously, NEPA requires federal agencies to take a hard look at the environmental consequences of a major action before taking it. <u>See</u> <u>supra</u>, 5-6. This can take the form of an Environmental Assessment ("EA"), as was done in the 2013-2105 Specifications, or an Environmental Impact Statement ("EIS"). When evaluating an agency's compliance with NEPA, the Court's role is not to substitute its judgment for that of the agency, but is rather "'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" <u>City of Olmstead Falls v. FAA</u>, 292 F.3d 261, 269 (D.C. Cir. 2002) (quoting <u>Baltimore Gas & Elec.</u>, 462 U.S. at 97-98); <u>NRDC v. Hodel</u>, 865 F.2d 288, 294 (D.C. Cir. 1988).

Environmental Assessments must include a "brief discussion . . . of alternatives . . . [and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). In considering the analogous requirement for an EIS, our Court of

Appeals explained that "the agency's choice of alternatives are . . . . evaluated in light of [its reasonably identified and defined] objectives; an alternative is properly excluded from consideration in an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" City of Alexandria v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) (quoting Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991)). Although an EA generally imposes less stringent requirements on an agency than an EIS, it is clear that even an EA's "hard look" must include consideration of reasonable alternatives. Am. Oceans Campaign, 183 F. Supp. 2d at 19-20. For the reasons outlined below, the Court concludes that Defendants have not acted arbitrarily or capriciously in deciding to rely on only two alternative ABC control rules.

1. Plaintiffs argue that Defendants acted arbitrarily and capriciously "by considering only two alternative ABC control rules" and for failing to consider the Lenfest and Pacific control rules proposed by Plaintiffs. Pls.' Mot. at 35-37. There is no set number of alternatives that an agency must consider; it need only consider alternatives that are reasonable. See 40 C.F.R. § 1502.14. An alternative is "reasonable" if it is objectively feasible as well as "reasonable in light of [the agency's] objectives." City of Alexandria, 198 F.3d at 867; see also 43 C.F.R. § 46.420(b)

(defining "reasonable alternatives" as those alternatives "that
are technically and economically practical or feasible and meet
the purpose and need of the proposed action").

       In actuality, Defendants considered three control rules in
the EA, as the regulations require a "no action" alternative to be
considered. See 40 C.F.R. § 1502.14(d) (requirement to include the
alternative   of   no   action);   AR   011032-34   (EA   summarizing
alternatives considered). Plaintiffs discount the "no action"
alternative, which would have maintained the 2012 OFL and ABC
specifications, see AR 011034, because it is not based on the most
recent stock assessment. Pls.' Mot. at 36. In Flaherty I, the Court
found that the "no action" alternative could not reasonably be
considered as an alternative because it contained no process for
establishing ACLs, as required by the recently revised MSA, and
therefore was clearly not a legally viable option. See Flaherty I,
850 F. Supp. 2d at 72-73 n. 23.

       The "no action" alternative here is easily distinguishable
from the one at issue in Flaherty I. The "no action" alternative
in Flaherty I would not have met the objectives of the action,
because it would not have established ACLs, whereas the present
"no action" alternative would fulfill the MSA's mandate to
implement a process for establishing ACLs. See Oceana, Inc. v.
Locke, 831 F. Supp. 2d at 127-32 ("no action" alternative would
have fulfilled MSA's mandate to set in place a process for

-30-

establishing ACLs and therefore was reasonably considered in satisfaction of NEPA). Nor have Plaintiffs shown that the "no action" alternative is otherwise inconsistent with the objectives of the Atlantic Herring FMP. See AR 011021-22 (listing objectives). While it is possible that, had it been selected, Plaintiffs could have shown that the "no action" alternative did not rely on the best available science, such an inquiry goes beyond the task at hand. Given that the "no action" alternative would have met the objectives of the action it was reasonable for Defendants to consider it as a viable alternative.

2.    Plaintiffs also dismiss the constant catch and 75% $F_{MSY}$ alternatives because they are allegedly not based on the best available science due to their failure to "account for herring's role as forage in the ecosystem." Pls.' Mot. at 37. The Court has already rejected Plaintiffs' argument that the constant catch control rule was not based on the best available science. See supra, 26-27. Plaintiffs make the same arguments with regard to the $F_{MSY}$ rule, and the arguments fail for the same reasons that they failed regarding the constant catch control rule. As this is Plaintiffs' only reason for discounting these two alternatives, the Court finds that they were properly considered.

3.    Plaintiffs argue that Defendants arbitrarily and capriciously failed to consider the Lenfest and Pacific Control Rules in the EA. The EA for the 2013-2015 Specifications includes

discussion of the Lenfest and Pacific Control Rules in the "Alternatives Considered but Rejected" section. AR 011065. Plaintiffs argue that "an alternative is properly excluded from consideration only 'if it would be reasonable for the agency to conclude that the alternative does not bring about the ends of the federal action,'" Pls.' Mot. at 38 (quoting Flaherty I, 850 F. Supp. 2d at 71) (emphasis in original), and that their control rules would have achieved the objectives at hand. Defendants argue that Plaintiffs' control rules were rejected because "they were outside the scope of the 2013-15 [S]pecifications, may not be applicable to management decisions generally, and their applicability to Atlantic herring was questionable." Defs.' Mot. at 28, 31.

The Plaintiffs' control rules are outside the scope, Defendants claim, because the SSC determined that implementation of them would require development of certain reference points through scientific assessment that would also need to be peer-reviewed prior to being adopted for long-term management of the fishery. Defs.' Mot. at 32 (citing AR 009280).

Plaintiffs counter that the SSC never made such a conclusion; it was NMFS that made such a conclusion. Pls.' Reply at 20 (citing AR 008677-78). While Plaintiffs are correct that the SSC did not explicitly say Plaintiffs' control rules were outside the scope, it did state that additional reference points were needed in its

-32-

explanation for why the rules could not be fully evaluated in its meeting. See AR 008677 ("[I]t is difficult to address the Pacific control rule because the specific values of the cutoff, buffer, and fraction have not been specified for Atlantic herring."). Even though Plaintiffs state that there is no basis for the conclusion that the absence of certain reference points put the two control rules outside the scope of the specifications, they do not explain why that reasoning is correct. Pls.' Reply at 20.

    4.   Defendants also argue that Plaintiffs' control rules "were of questionable applicability to management decisions generally." Defs.' Mot. at 32; see also AR 009280 ("The Herring PDT expressed concern about adopting either control rule in the 2013-2015 [S]pecifications package, as it represents a significant change in management strategy."). NMFS also noted in the EA that one of the studies relied on by Plaintiff's control rule alternatives recommended not using their reference points for tactical management decisions. AR 009279; see also AR 004408 (Anthony Smith et al., Impacts of Fishing Low-Trophic Level Species on Marine Ecosystems, 333 SCIENCE 1147, 1150 (August 26, 2011)). Plaintiffs dispute this reading of the study, arguing that the study was "merely making the point that the specific model choice ultimately made by managers should be tailored to the ecosystem." Pls.' Reply at 21.

-33-

The SSC also disagreed with the use of an ABC control rule in which a small change in biomass made a large and sudden change in the acceptable catch, as the Pacific Control Rule did. AR 008678. Plaintiffs counter that Defendants have already implemented this rule on the West Coast for herring and other forage species, and, in any event, it did not prevent consideration of the Lenfest Control Rule. Pls.' Reply at 21. The Court agrees that this should have had no impact on consideration of the Lenfest Control Rule. In addition, the SSC's preference for rules without drastic changes in the ACL does not put the Pacific Control Rule outside the scope of the objectives, and by itself is not sufficient justification for not considering it. Because the Court finds the other reasons given by Defendants for rejecting the Lenfest and Pacific Control Rules to be adequate, the insufficiency of this reason does not affect the outcome.

5.    Defendants argue that Plaintiffs' control rules were of questionable applicability to the Atlantic herring fishery, due to the fact that the studies they relied on used a static natural mortality rate, while the SAW 54 used a time varying natural mortality rate. Defs.' Mot. at 32-33 (citing AR 009278). Plaintiffs concede that a dynamic natural mortality estimate is an improvement over a static natural mortality rate, but argue that the benefit "does not negate the need for an appropriate [i.e. Plaintiffs']

-34-

control rule when setting catch limits for forage fish." Pls.' Reply at 22.

Such a balancing of factors is precisely the type of task that is best left to the agency's expertise, rather than the Court's. Plaintiffs also argue that the alternatives could have been modified for the Atlantic herring fishery. Pls.' Reply at 22. Again, the decision of whether or how Plaintiffs' control rules could have been modified to fit the objectives of the 2013-2015 Specifications lies within the Secretary's area of expertise, not the Court's, and is entitled to deference. See Grand Canyon Trust v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002).

Defendants provided an adequate discussion and explanation of their reasons for rejecting the Lenfest and Pacific Control Rule alternatives, and the Court defers to NMFS's conclusion that they were not appropriately applicable at this time. Defendants considered three control rule alternatives in the EA and have satisfied their NEPA obligations. Even if the Court were to discount the no-action alternative, as Plaintiffs argued, the Court still finds that Defendants considered reasonable alternatives for purposes of NEPA.

### d. Defendants Did Not Violate the Court's 2012 Remedial Order

As part of this Court's 2012 Flaherty I decision, the Court issued a remedial order requiring Defendants to, among other

-35-

things, consider "as part of the 2013-2015 herring specifications
(or another appropriate action to be completed within one year of
the date of this Memorandum Order), . . . at least one [ABC control
rule for the Atlantic herring fishery] based on the most recent
best available science for setting ABC control rules for herring
and other forage fish." August 2, 2012 Remedial Order, 12-13
("Remedial Order") [Dkt. No. 41]. Plaintiffs argue that
Defendants' failure "to consider even one control rule consistent
with the [Remedial] Order" was arbitrary and capricious and
violated the APA. Pls.' Mot. at 40.

Plaintiffs previously raised this argument in their Motion to
Enforce the Remedial Order [Dkt. No. 62], which the Court denied.
See February 19, 2014 Memorandum Opinion [Dkt. No. 87]. This Court
found that the Council had "considered two alternatives to the ABC
Control Rule in the Environmental Assessment it prepared for the
2013-2015 Specifications, and Defendants attached that analysis to
its Final Remedial Report as required." Id. at 7. After finding
that Defendants had "considered and addressed each of [the] issues"
in the Remedial Order, this Court denied the motion to enforce.
Id. at 11-12.

"Plaintiffs have obtained all of the relief to which they are
entitled" under the Remedial Order, id. at 12, and therefore they
cannot base further claims on alleged violations of the Remedial
Order.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is **denied**, Defendant-Intervenor SFC's Motion for Summary Judgment is **denied**, and Defendants' Motion for Summary Judgment is **granted**.

An Order will issue with this opinion.


June 14, 2016                                    _G Gladys Kessler_
                                                 Gladys Kessler
                                                 United States District Judge



<u>Copies to</u>: attorneys on record via ECF