# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL S. FLAHERTY *et al.*,

  *Plaintiffs*,

v.

WILBUR ROSS *et al.*,

  *Defendants*.

Civil Action No. 11-660 (TJK)

## MEMORANDUM OPINION

Plaintiffs Michael Flaherty, Captain Alan Hastbacka, and the Ocean River Institute filed their initial complaint in 2011. They sued the Secretary of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service ("the Service"), alleging that Defendants violated the Magnuson-Stevens Act and the Administrative Procedure Act in amending a federal fishery management plan covering the Atlantic herring fishery in the northeastern United States.

Over the course of the litigation, including multiple rulings from this Court, Plaintiffs have several times amended or supplemented their complaint, updating their challenges to reflect Defendants' subsequent amendments to the plan. Perhaps frustrated with what they perceived as an inability to compel the specific changes to the plan they seek, Plaintiffs most recently amended their complaint to include two claims. They assert those claims—Count II and Count III—directly against the New England Fishery Management Council ("the Council"), the body that developed the plan at issue and proposed it to Defendants. But Plaintiffs face an ultimately fatal obstacle: the Council is not an "agency" as that term is defined under the Administrative Procedure Act. And Defendants, along with the Sustainable Fisheries Coalition ("Defendant-Intervenor"), which intervened as a defendant, have filed motions to dismiss Counts II and III on

that basis, among others. Because the Court holds that the Council is not an "agency" as defined under the Administrative Procedure Act, the Court lacks jurisdiction over Plaintiffs' claims against it and Counts II and III must be dismissed. Accordingly, and for the reasons explained below, the motions will be granted.

## I. Factual and Procedural Background

### A. The Magnuson-Stevens Act

Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA" or "Act"), 16 U.S.C. § 1801 *et seq.*, in 1976 to conserve and manage the Nation's fishery resources. The Act establishes a "national program for the conservation and management of" those resources with the aim to "prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(6). Congress nominally placed this program and its attendant responsibilities under the authority of the Secretary of Commerce, but in practice the Secretary delegates that authority to the Service, a sub-agency of the National Oceanic and Atmospheric Administration. *See NRDC v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014).

A key feature of the MSA's conservation and management program are its "fishery management plans" (FMPs), which are designed to "achieve and maintain, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1801(b)(4). The Act defines a "fishery" as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, recreational, and economic characteristics," as well as "any fishing for such stocks." *Id.* § 1802(13). A "stock of fish" is defined as "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit." *Id.* § 1802(42). Each FMP must include the "conservation

and management measures"—*e.g.*, catch quotas, restrictions on fishing technique and gear, and other rules and regulations—"necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1).

To develop the FMPs, among other tasks, "[t]he Act established eight regional Fishery Management Councils, each of which has 'authority over a specific geographic region and is composed of members who represent the interests of the states included in that region." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 667 (D.C. Cir. 2016) (quoting *C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1557–58 (D.C. Cir. 1991)). The councils are "comprised of state and federal officials from the region with 'marine fishery management responsibility and expertise,' as well as individuals appointed by the Secretary of Commerce." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 100 (D.D.C. 2011) (quoting 16 U.S.C. § 1852(b)). And the MSA provides that "[e]ach Council shall, . . . for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary (A) a fishery management plan, and (B) amendments to each such plan that are necessary from time to time." 16 U.S.C. § 1852(h). As relevant here, the Council oversees fisheries in the Atlantic Ocean off the coast of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. *Id.* § 1852(a)(1)(A).

The Fishery Management Councils, however, "ha[ve] no authority to promulgate federal rules." *Anglers Conservation Network*, 809 F.3d at 667 (citing *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 112 n.15 (3d Cir. 2011)). Once a Fishery Management Council develops a proposed FMP or amendment to such a plan, it must then submit that proposal, along with draft regulations it considers necessary to implement the proposal, to the Secretary—in practice, the Service—to review for consistency with the MSA's

requirements and other applicable law. *See* 16 U.S.C. §§ 1852(h)(1), 1854(a)–(b). The Service must publish the proposal in the Federal Register and facilitate a notice-and-comment process, after which it must "approve, disapprove, or partially approve [the proposal]." *Id.* § 1854(a). The MSA prescribes a similar procedure for the implementing regulations. *See id.* § 1854(b). "If, upon completing this review, [the Service] approves the FMP or amendment, a final rule and one or more implementing regulations are published in the Federal Register." *Oceana*, 831 F. Supp. 2d at 101 (citing 16 U.S.C. § 1854(b)(3)). That FMP, as incorporated into a final rule, and any accompanying regulations, are subject to judicial review under the APA upon filing of a petition within 30 days of promulgation. 16 U.S.C. § 1855(f)(1).

B. **The Atlantic Herring Fishery Management Plan**

The FMP at issue here protects and manages Atlantic herring. *See Flaherty v. Bryson*, 850 F. Supp. 2d 38, 45 (D.D.C. 2012) ("*Flaherty I*").[1] That plan (the "Herring FMP") first became effective in 2001, and since then the Council and the Service have periodically updated the Herring FMP with amendments, some of which have been addressed by this Court over the course of this lawsuit. *See Flaherty v. Pritzker*, 195 F. Supp. 3d 136, 141–43 (D.D.C. 2016) ("*Flaherty II*") (discussing the factual and procedural history of this case). Atlantic herring are primarily harvested by trawler vessels, which drag nets behind them to collect the herring and, typically, ensnare other fish and marine wildlife as well. *See Flaherty I*, 850 F. Supp. 2d at 45.

Plaintiffs are particularly concerned with two species of fish—river herring and shad—that they allege are "inextricably involved" with the Atlantic herring fishery and are harvested by vessels and incidentally caught as bycatch by vessels fishing for Atlantic herring. *See* ECF No. 158 ("3d Am. Compl.") ¶¶ 71–77; *Flaherty I*, 850 F. Supp. 2d at 45–47. Neither river herring

---

[1] A more detailed background of the Atlantic herring fishery and the Council's Atlantic herring FMP is set forth in the Court's previous opinion in *Flaherty I*, 850 F. Supp. 2d 38.

nor shad have been designated as a "stock" within the Atlantic herring fishery such that they would be directly subject to annual catch limits and other conservation and management measures under the Herring FMP. *Flaherty I*, 850 F. Supp. 2d at 50–51. Throughout this action, Plaintiffs have insisted that not including them violates the MSA. *Id.* at 50–56; 3d Am. Compl. ¶¶ 82, 107–147 (Counts I–III).

C. **Procedural History**

Plaintiffs commenced this action in April 2011, filing a complaint that challenged the Service's final rule adopting an amendment—"Amendment 4"—to the Herring FMP. *See* ECF No. 1. Among other claims, the complaint alleged that the Herring FMP did not comply with the requirements of the MSA and other applicable law because it failed to include river herring and shad as "stocks" in the fishery. *Id.* ¶¶ 70–82. On March 9, 2012, this Court found that the Service had failed to adequately review the proposal not to include those stocks and granted summary judgment to Plaintiffs on that question. *Flaherty I*, 850 F. Supp. 2d at 56. The Court later entered a remedial order that, among other things, remanded Amendment 4 to the Service for reconsideration and required the Service to send a letter to the Council "recommending that the Council consider . . . whether 'river herring [and shad]' should be designated as a stock in the fishery" based on certain information and materials identified by the Court. *See* ECF No. 41 at 10–12.

On August 31, 2012, the Service filed a supplemental letter to the Court explaining that, upon reconsideration, the Service concluded that Amendment 4 complied with applicable law. *See* ECF No. 42-1. On November 22, 2013, Plaintiffs moved to enforce the remedial order, arguing that the Service, in reconsidering Amendment 4, violated the Court's instructions. ECF No. 62. While that motion was pending, Defendant-Intervenor filed an unopposed motion to intervene, which the Court granted. *See* ECF Nos. 76, 85. On February 19, 2014, after briefing

5

and a hearing, the Court denied Plaintiffs' motion to enforce. *See Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 54 (D.D.C 2014) ("*Flaherty III*").

While those matters were proceeding, the Council developed Amendment 5 to the Herring FMP, in which it again did not designate river herring or shad as "stocks" in the fishery. The Service approved the proposal and published a final rule implementing Amendment 5 on February 13, 2014. *See* Fisheries of the Northeastern United States; Atlantic Herring Fishery; Amendment 5, 79 Fed. Reg. 8786, 8796 (Feb. 13, 2014). Plaintiffs, with the Court's leave, filed a supplemental complaint challenging the implementation of Amendment 5, *see* ECF No. 94, which Defendants answered, ECF No. 108. Over the course of the next two years, the parties filed periodic status reports updating the Court on efforts by the Council and Service that might resolve the parties' dispute, including the Council's review of whether to develop a new amendment to add river herring and shad to the Herring FMP. *See* ECF Nos. 122, 125, 131, 144; *see also* ECF No. 147; 3d Am. Compl. ¶¶ 99–106.

When the Council decided not to immediately undertake new action to include those two species in a proposed amendment, however, Plaintiffs sought leave to amend their complaint to name the Council as a defendant and bring claims directly against the Council for failure to comply with the MSA and the APA. *See* ECF No. 152. They sought to add claims that the Council violated the APA when (1) it submitted Amendment 5 without designating river herring and shad stocks of the fishery (Count II) and (2) it failed to subsequently initiate an amendment to add river herring and shad as stocks in the fishery (Count III). 3d Am. Compl. ¶¶ 126–47. Defendants opposed, arguing that the Council's actions at issue were not "final agency actions" subject to review under the APA—because the Council was not an "agency" under the statute and, regardless, because the actions were not "final"—and thus that the amendments would be

6

futile. *See* ECF No. 153. The Court, noting that the parties had raised "novel legal issues," found those issues better suited for more targeted briefing on a motion to dismiss. *See* ECF No. 157. Accordingly, on August 21, 2017, the Court granted Plaintiffs' motion to amend the complaint. *See* ECF No. 156. And on September 14, 2017, the case was directly reassigned to the undersigned.

On October 6, 2017, Defendants moved to dismiss Counts II and III for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 164 ("Defs.' MTD"). Defendant-Intervenor filed a similar motion to dismiss those two counts but pursuant to Rule 12(b)(1) and (6), arguing that the Court lacked jurisdiction over claims against the Council and that the MSA precluded Plaintiffs from bringing the claims raised in those counts. ECF No. 166 ("Def.-Int.'s MTD").

## II.     Legal Standard

Federal courts are courts of limited subject-matter jurisdiction. "It is to be presumed that a cause of action lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). The scope of that jurisdiction is delineated both by Article III and statutory limits, and "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

Under Rule 12(b)(1), a party may move to dismiss a claim because the Court lacks subject-matter jurisdiction to hear it. *See* Fed. R. Civ. P. 12(b)(1). But federal courts also have "an independent obligation to determine whether subject-matter jurisdiction exists," even when jurisdictional defects are not specifically identified by the parties. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). When considering whether subject-matter jurisdiction exists, the Court

must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [Plaintiffs] the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). The Court may, however, consider materials outside the pleadings. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

## III. Analysis

The key question raised by the instant motions can be stated simply: is the Council an "agency" as that term is defined under the APA? Defendants, presumably relying on the APA's general requirement that there have been "agency action," *see* 5 U.S.C. §§ 702, 704, treat this inquiry as one addressing whether Plaintiffs have stated a claim upon which relief can be granted, and therefore suited for review under Rule 12(b)(6). *See* Defs.' MTD at 1, 14; ECF No. 168 ("Defs.' Reply") at 6. Defendant-Intervenor, for its part, argues that the Court's jurisdiction depends on whether the Council qualifies as an "agency," but it appears to presume jurisdiction hinges on the premise that the Council must be an agency to take the kind of "agency action" that would sustain a cause of action under the APA. *See* Def.-Int.'s MTD at 8, 10. The Court, however, finds that it lacks jurisdiction for a more fundamental reason—the United States has not waived its sovereign immunity as to these claims against the Council.

"Absent a waiver of sovereign immunity, the Federal Government is immune from suit." *Loeffler v. Frank*, 486 U.S. 549, 554 (1988). And whether sovereign immunity bars a particular claim is "jurisdictional in nature." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Id.* (alteration in original) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). "Moreover, a waiver of the [g]overnment's sovereign immunity will be strictly

construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). That the parties have not framed the dispute as one about the sovereign immunity of the Council is of no moment. Like other jurisdictional concerns, "[w]hether the United States has consented to be sued '. . . may be raised at any time, either by the parties or by the court sua sponte.'" *Brown v. Sec'y of the Army*, 78 F.3d 645, 648 (D.C. Cir. 1996) (quoting *Mellos v. Brownell*, 250 F.2d 35, 36 (D.C. Cir. 1957) (per curiam)).

Ordinarily, § 702 of the APA provides a waiver of the federal government's sovereign immunity when a plaintiff sues the federal government seeking, as Plaintiffs do here, "relief other than money damages." 5 U.S.C. § 702. But the provision specifically "refer[s] to a claim against an 'agency' and hence waives immunity only when the defendant falls within that category." *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006); *see also Anderson v. Carter*, 802 F.3d 4, 8–9 (D.C. Cir. 2015) (finding that sovereign immunity barred the plaintiff's APA claims against the Secretary of Defense and subordinate officers in their official capacity because they did not meet the APA's definition of "agency"); *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) ("Clark, however, may not take advantage of [the APA's] broad waiver of sovereign immunity since the Library of Congress is not an 'agency' as defined under the [APA]."). The Court now turns to whether the Council is in fact an "agency," such that the APA's waiver of sovereign immunity applies.

A. **Relevant Case Law**

For purposes of § 702, the APA defines "agency," in relevant part, to mean "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 701(b)(1). As the D.C. Circuit has recognized, that definition "is not entirely clear." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971). But in *Soucie*, the seminal case addressing the question, the Circuit concluded that the APA "confers agency

9

status on any administrative unit with *substantial independent authority* in the exercise of specific functions." *Id.* (emphasis added). In that case, the Circuit determined that the Office of Science and Technology (OST) was an "agency" under the Freedom of Information Act (FOIA)[2] because OST engaged in the "independent function of evaluating federal programs," including by wielding the "investigatory power" of Congress. *Id.* at 1075 & n.27.

Since *Soucie*, the Circuit has repeatedly grappled with the contours of the "substantial independent authority" standard. In *Grumman Aircraft Engineering Corp. v. Renegotiation Board*, 482 F.2d 710, 715 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975), the Circuit examined entities known as "Regional Boards," which aided the federal government's Renegotiation Board in reviewing and renegotiating federal government contracts. The Circuit concluded that these Regional Boards were "agencies" as defined in 5 U.S.C. § 551(1) after determining that they had been "granted what *Soucie* termed 'substantial independent authority.'" *Id.* at 714–15. The Circuit noted that the Regional Boards had their own investigating and negotiating personnel and that they negotiated directly with private contractors before any involvement by the Renegotiation Board. *Id.* at 715. Indeed, it appears that in many cases, the Renegotiation Board's review of a recommendation by a Regional Board was merely "perfunctory." *Id.* at 713 & n.7. The Circuit also emphasized, critically, that the Regional Boards were "empowered to make final decisions not even reviewable by the [Renegotiation] Board"—in what were labeled "Class B" cases that did not meet a minimum contract amount.

---

[2] FOIA incorporates the APA's definition of "agency" in § 551, *see* 5 U.S.C. § 552(f), which is for all material purposes identical to the definition found in § 701(b)(1), and thus interpretations of the phrase "authority of the Government of the United States" have been applied interchangeably by courts in the FOIA and APA contexts. *See McKinney v. Caldera*, 141 F. Supp. 2d 25, 31–32 & n.13 (D.D.C. 2001), *aff'd*, 291 F.3d 851 (D.C. Cir. 2002); *see also Dong v. Smithsonian Inst.*, 125 F.3d 877, 878–79 (D.C. Cir. 1997).

*Id.* at 715 & n.20.[3] Lastly, the Circuit recognized that in crafting the Renegotiation Board's enabling legislation, Congress appeared to have assumed that the Regional Boards would themselves be "agencies." *Id.* at 716 ("The Board may delegate . . . any function, power, or duty . . . *to any agency* . . . , *including any such agency established by the Board*." (quoting 50 U.S.C. § 1217(d)). Based on these considerations, the Circuit concluded that the Regional Boards qualified as "agencies" as defined in 5 U.S.C. § 551(1). *Id.*

In *Washington Research Project, Inc. v. Department of Health, Education, and Welfare*, 504 F.2d 238 (D.C. Cir. 1974), the Circuit, applying *Soucie* and *Grumman*, reached the opposite conclusion. At issue were "initial review groups" (IRGs) established by the National Institute of Mental Health (NIMH) to assist in the review of grant applications. *Id.* at 245–248. Contrasting the IRGs from the entities examined in the prior cases, the Circuit determined that the IRGs did not constitute "agencies" because they "confine[d] themselves to making recommendations." *Id.* at 247. In effect, they were "consultants." *Id.* at 247–48. It did not matter that, in many cases, the IRG recommendations were given only cursory review, so that they were "an often crucial element in the approval process." *Id.* at 248. Rather, according to the Circuit, "[t]he important consideration [was] whether [the IRG] ha[d] any authority in law to make decisions." *Id.* And in that case that authority rested with NIMH and its subcomponent the National Advisory Mental Health Council, not the IRGs. *Id.*

---

[3] The Supreme Court reversed the D.C. Circuit's decision in *Grumman* on separate grounds, declining to address the Circuit's determination that the Regional Board qualified as an "agency" under 5 U.S.C. § 551(1). *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975). The Court did "note in passing," however, that the Circuit's conclusion that the Renegotiation Board's "status as an agency stemmed from its power to issue 'orders' in Class B cases" found support in the applicable case law. *Id.* at 188 n.25.

In a later case addressing the Defense Nuclear Facilities Safety Board, an entity associated with the Department of Energy, the Circuit determined that the Board qualified as an "agency" under FOIA for several reasons. *See Energy Research Found. v. Def. Nuclear Facilities Safety Bd.*, 917 F.2d 581, 585 (D.C. Cir. 1990). As one of those grounds, the Circuit, citing *Soucie*, concluded that the Board qualified as an "agency" because it did "considerably more than merely offer advice" and "ha[d] at its disposal the full panoply of investigate powers commonly held by other agencies of the government." *Id.* at 584.

The Circuit revisited the issue in more depth in *Dong v. Smithsonian Institute*, 125 F.3d 877 (D.C. Cir. 1997). In that case, the Circuit determined that the Smithsonian did not constitute an "agency" under the Privacy Act, which, like FOIA, incorporates the APA's general definition. *See id.* at 878–82. Examining that definition, the Circuit reasoned that "for an entity to *be* an authority of the government it must *exercise* some governmental authority." *Id.* at 881. The "requirement of *authority*," it explained, "derives both from the statutory language itself and from legislative history characterizing the requisite type of authority"—namely, "final and binding." *Id.* (quoting H.R. Rep. No. 79-1980, at 19 (1946)). And it clarified further that simply because "an organization makes decisions does not always mean that it is a government agency." *Id.* (quoting *Pub. Citizen Health Research Grp. v. Dep't of Health, Educ. & Welfare*, 668 F.2d 537, 543 (D.C. Cir. 1981)). The entity must possess "*substantial* independent authority." *Id.* at 882. To illustrate, it noted a district court opinion, summarily affirmed by the Circuit, finding that the National Academy of Sciences was not an "agency" under § 551(1), even though it possessed the authority "to veto the Environmental Protection Agency's suspension of auto emission standards," because its primary role was advisory. *Id.* (citing *Lombardo v. Handler*, 397 F. Supp. 792, 794 (D.D.C. 1975), *aff'd*, 546 F.2d 1043 (D.C. Cir. 1976) (table decision)).

In determining whether the Council is an "agency" under the APA, these cases provide instructive principles. They repeatedly emphasize that the touchstone of agency status is the exercise of "substantial independent authority." And while they present certain examples of such authority, they "underscore the need to examine the structure, function, and mandate of [the agency] itself." *McKinney*, 141 F. Supp. 2d at 33. Indeed, the Circuit has recognized that given "the myriad organizational arrangements for getting the business of the government done[,] . . . [t]he unavoidable fact is that each new arrangement must be examined anew and in its own context." *Wash. Research Project*, 504 F.2d at 246. With that, the Court turns to address the particular entity at issue.

B.     **Whether the Council Is an "Agency" for Purposes of 5 U.S.C. § 702**

At its core, the Council is an advisory body. Congress established the Regional Fishery Management Councils "to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of [fishery management] plans." 16 U.S.C. § 1801(b)(5). But in pursuit of that aim, the Council's primary functions are to "prepare and submit to the Secretary" fishery management plans and later amendments, to hold public hearings "to allow all interested persons an opportunity to be heard in the development of fishery management plans," and to conduct research and report its findings to the Service and the Secretary. *See id*. § 1852(h). The Council has no authority to promulgate rules. *Anglers Conservation Network*, 809 F.3d at 667 (citing *Scallop Fishermen*, 635 F.3d at 112 n.15). Indeed, none of its proposed plans or regulations are effective until the Secretary has reviewed them, conducted notice-and-comment rulemaking, and approved their contents. *See* 16 U.S.C. § 1854(a)–(b).

In that regard, the Council resembles the IRGs examined in *Washington Research Project*, serving as an advisory body to the Secretary and the Service equipped to make

recommendations. *See* 504 F.2d at 248. To be sure, the Council is heavily involved in the development of FMPs—much more so than it appears the IRGs were involved in decisions whether to make grant awards. Indeed, that is by statutory design. *See* 16 U.S.C. § 1801(b)(5). The Council, along with its regional peers, is provided considerable resources to conduct research, issue reports, and develop proposals. *See id.* § 1852(f), (h). But the Council's plans and accompanying regulations still do not "achieve the dignity of an agency's final decision" until the Secretary reviews and adopts them. *Wash. Research Project*, 504 F.2d at 248. And thus the Council does not "by law ha[ve] authority to take final and binding action affecting the rights and obligations of individuals." *Dong*, 125 F.3d at 881 (quoting James O. Freedman, *Administrative Procedure and the Control of Foreign Direct Investment*, 119 U. Pa. L. Rev. 1, 9 (1970)); *see also Grumman*, 482 F.2d at 715 (noting, in finding that the Regional Boards were "agencies," that they were "empowered to make final decisions not even reviewable by the [Renegotiation] Board"). That authority remains with the Secretary and, by delegation, the Service. The Council, on the other hand, does not "exercise [substantial] governmental authority" such that it is "an authority of the government." *Dong*, 125 F.3d at 881 (emphasis removed).[4]

The rest of the MSA only reinforces the advisory nature of the Council's role. Not only does the MSA reserve the authority to adopt FMPs for the Secretary, but matters of implementation and enforcement are left to the Secretary as well. *See* 16 U.S.C. § 1855(d)

---

[4] As part of the 2007 amendments to the MSA, Congress included the following finding: "A number of Fishery Management Councils have demonstrated significant progress in integrating ecosystem considerations in fisheries management using the existing authorities provided under this chapter." 16 U.S.C. § 1801(a)(11). The Court does not read this statement to suggest that Congress considers the Councils to be a governmental "authority" as that term is used in 5 U.S.C. § 701(b)(1) and has been understood by courts in this Circuit.

14

(providing the Secretary authority to "carry out any [FMP] approved or prepared by him"); *id.* §§ 1858–61 (reserving powers of investigation and enforcement for the Secretary). Indeed, it appears that the MSA deliberately channels decision-making authority through the Secretary, whose actions Congress expressly made subject to judicial review. *See* 16 U.S.C. § 1855(f); *see also id.* § 1861(d) (granting federal district courts jurisdiction over "any case or controversy" stemming from the Secretary's enforcement of the MSA and its attendant regulations).[5] Particularly relevant here, the MSA's judicial review provision for FMPs and any additional implementing regulations provides solely for review of such regulations as "promulgated *by the Secretary*." *Id.* § 1855(f) (emphasis added). Defendants argue that this provision implicitly precludes the actions Plaintiffs bring against the Council under the APA. *See* Defs.' MTD at 15–19. While that may be so, the Court views § 1855(f) as further evidence that the MSA does not contemplate that the Council functions beyond the role of expert advisor. The critical action when it comes to the adoption or amendment of FMPs—the action that Congress saw fit specifically to subject to judicial review—is the approval and promulgation by the Secretary after his own review for consistency with the existing plans, the MSA, and other applicable law.

The Court furthermore notes that it does not write on a blank slate. The one other court that appears to have directly addressed the status of the MSA's Fishery Management Councils as "agencies" likewise concluded, while acknowledging that "the question [was] a close one," that

---

[5] Though § 1861(d) does not by its terms limit its grant of jurisdiction to enforcement actions, courts have recognized that the provision should be read only to refer to cases arising from enforcement actions. *See, e.g.*, *Kramer v. Mosbacher*, 878 F.2d 134, 136 (4th Cir. 1989); *Delta Commercial Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council*, 259 F. Supp. 2d 511, 516 (E.D. La. 2003), *aff'd*, 364 F.3d 269 (5th Cir. 2004); *see also id.* (noting that, regardless, the definition of "provisions of this chapter," 16 U.S.C. § 1861(j), would limit § 1861(d)'s reach to actions regarding regulations and permits, both of which are responsibilities reserved for the Secretary).

they did not possess the requisite substantial "independent authority," and relied heavily on precedent from this Circuit in so concluding. *See J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1157–59 (E.D. Va. 1995). In fact, the D.C. Circuit in *Dong* specifically cited *J.H. Miles* as an example of a court holding that an entity could not "*be* an authority of the government" because it did not "*exercise* some governmental authority." 125 F.3d at 881. Several other courts have also accepted that the MSA's Fishery Management Councils are not "agencies" under the APA, though they provided no detailed reasoning. *See Scallop Fishermen*, 635 F.3d at 112 n.15 ("The fishermen concede—as they must—that the [New England Council] is not itself an 'agency' . . . under the APA.");[6] *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 437 (D.D.C. 2014) ("An action by the Mid-Atlantic Council does not qualify as an 'agency action' under the APA because, as Plaintiffs appear to concede, a fishery management council is not itself an 'agency' subject to judicial review." (citation and quotation marks omitted)). While the Court does not place great weight on these cases in reaching its conclusion here, it finds the courts' assuredness telling.

The Court also is mindful of its obligation to strictly construe waivers of sovereign immunity in favor of the federal government. *Lane*, 518 U.S. at 192. The Court would arrive at the same conclusion—that the Council is not an "agency" as defined in 5 U.S.C. § 701 and therefore that the waiver of sovereign immunity in § 702 does not apply here—regardless of that obligation, but it underscores that the MSA should not be read to confer agency status on the Council such that it is subject to suit. *See Anderson*, 802 F.3d at 9 (citing this principle in

---

[6] The D.C. Circuit cited this footnote in *Anglers Conservation Network* for the proposition that the Councils have "no authority to promulgate federal rules." 809 F.3d at 667.

refusing to adopt the plaintiff's liberal interpretation of the scope of § 701's definition of "agency").

In arguing that the Council does qualify as an "agency" under § 702, Plaintiffs appear to overstate the Council's authority under the MSA. They repeatedly contend that many of the Council's decisions in developing FMPs are "unreviewable," though they point to no provision in the MSA to support that assertion. *See* ECF No. 167 ("Pls.' Opp'n") at 21–23. Rather, they argue that because the Council may decide what to include in *its own proposed plans*, choices the Secretary certainly does not directly control, those decisions are necessarily unreviewable. To be sure, § 1854(a) does not appear to permit the Secretary to modify the Council's proposals as he sees fit. But the proposed plans still have no binding effect until the Secretary has independently reviewed them, ensured that they are consistent with the objects of the MSA and that they comply with any applicable law, and adopted them after notice and comment. *See Flaherty I*, 850 F. Supp. 2d at 54 ("While . . . it is the Council's role to name the species to be managed 'in the first instance,' it is [the Service's] role, in the second instance, to ensure that the Council has done its job properly under the MSA and any other applicable law.").

Moreover, Plaintiffs appear to operate on the assumption that the Secretary's ability to review those proposals is somehow circumscribed and limited to something like an "abuse-of-discretion" review. *See* Pls.' Opp'n at 20. Nothing in § 1854 or elsewhere in the MSA prescribes as much. If the Secretary determines that the Council's proposal does not meet the requirements of the Act, the Secretary can, indeed *must*, disapprove of their proposal, which will continue to have no binding effect. *See* 16 U.S.C. § 1854(a); *Flaherty I*, 850 F. Supp. 2d at 54 ("While [the Service] *may* defer to the Council on policy choices, the [MSA] plainly gives [the Service] the final responsibility for ensuring that any FMP is consistent with the MSA's National

Standards, and 'the overall objectives' of the Act." (emphasis added) (quoting *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 71–72 (D.D.C. 2007))).[7]

Plaintiffs also point to the Circuit's acknowledgment of the power to "investigate" as a well-established "authority" of the government, contending that Congress conferred such powers on the Council. *See* Pls.' Opp'n at 20–21. But the mandate to conduct research and present findings, as the Council must do under the MSA, is a far cry from the "power of investigation" contemplated by the Circuit in *Soucie*, 448 F.2d at 1075 n.27 (citing *McCrain v. Daugherty*, 273 U.S. 135 (1927), which affirmed the United States Senate's powers to subpoena testimony from the Attorney General), and in *Energy Research Foundation*, 917 F.2d at 584–85 (discussing the Safety Board's "full panoply of investigative powers commonly held by other agencies of government" at its disposal to investigate the practices of the Department of Energy).

Plaintiffs do point to one circumstance in which the Council wields a degree of regulatory authority. They point out that § 1854(h) provides that the Secretary may not "repeal or revoke" an FMP unless the relevant Fishery Management Council approves of the repeal or revocation by a three-quarters majority vote. Given the Secretary's general duty to carry out the MSA's

---

[7] The Court recognizes that in *J.H. Miles*, the court did in fact characterize the Secretary's review of the Council as "analogous to an 'abuse of discretion' or 'clear error' standard." *J.H. Miles*, 910 F. Supp. at 1158–59. That characterization, however, was based solely on a single regulation, applicable only to a particular fishery and Fishery Management Council, stating that the Service can only modify catch quotas proposed by the Mid-Atlantic Fishery Management Council (MAFMC) "if he/she can demonstrate that the MAFMC's recommendations violate the national standards of the [MSA] or the objectives of the Atlantic Surfclam and Ocean Quahog FMP or other applicable law." 50 C.F.R. § 648.72(a)(2). As an initial matter, it is not even clear whether that language should be read to require a more restrictive review than that prescribed by Congress generally for Council proposals in 16 U.S.C. § 1854(a)–(b). More importantly, the Court, in determining whether Fishery Management Councils constitute "agencies" under the APA, does not afford much weight to a single regulation, particularly in light of statutory indications to the contrary in the MSA. And notably, even *with* that understanding, the court in *J.H. Miles* still concluded that the Fishery Management Councils were not agencies under the APA.

objectives, the Court struggles to see how the ability to repeal an FMP, provided it were necessary under the Act, differs in practice from the ability to amend FMPs in pursuit of those same objectives. More importantly, however, the Council's ability to prevent one type of action by the Secretary does not, on its own, confer agency status on it, particularly given the Council's powerlessness otherwise to take any binding *affirmative* action. *See Dong*, 125 F.3d at 882 (citing *Lombardo*, 397 F. Supp. at 794). That limited veto power, upon consideration of the Council's otherwise non-binding activities and function within the broader scheme of the MSA, is insufficient for the Court to conclude that the Council possesses the degree of "substantial independent authority" necessary to elevate the Council to the status of "agency."

Ultimately, the Court, echoing the Circuit, recognizes that the APA's definition of "agency" does not lend itself to bright-line rules. But that has not prevented the Circuit from highlighting some tell-tale features pertinent here. Given those instructions, and upon consideration of the structure and function of the Council within the context of the MSA, the Court does not find that the Council exercises "substantial independent authority" such that it qualifies as an "agency" for purposes of 5 U.S.C. § 702.

## IV. Conclusion

For the above reasons, the Court concludes that Congress, through the APA, has not waived the federal government's sovereign immunity as applied to the Council. Thus, the Court lacks subject-matter jurisdiction over Plaintiffs' claims against it. As a result, Defendants' Motion to Dismiss Counts II and III, ECF No. 164, and Defendant-Intervenor's Motion to

Dismiss in Part, ECF No. 166, will be granted, and the Council will be dismissed as a Defendant.

A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 9, 2019